**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PARSONS & WHITTEMORE** | ) | |
| **ENTERPRISES CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 09-631-CG-B** |
| | ) | |
| **CELLO ENERGY, LLC, et al.,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |

## ORDER

On September 25, 2009, Parsons and Whittemore Enterprises Corporation ("P&W")

brought a lawsuit against Cello Energy, LLC ("Cello"), Boykin Trust, LLC ("Boykin Trust"),

Vesta Venture, L.L.C. ("Vesta"), Forest Technologies, LLC ("Forest Technologies"), Jack W.

Boykin ("Jack Boykin"), Lois Anne Cowin Boykin ("Lois Boykin"), Allen Boykin, and Elisa

Boykin Rambo ("Elisa Rambo") pursuant to the Alabama Uniform Fraudulent Transfer Act

("AUFTA") to "avoid and/or to prevent fraudulent transfers made and proposed to be made by

and among members of the Boykin Family and entities they control." (Doc. 1, p. 1). This matter

is now before the court on (1) Cello, Boykin Trust, Forest Technologies, Jack Boykin, Lois

Boykin and Allen Boykin's (hereinafter referred to as the "Cello Defendants") motion for

summary judgment (Doc. 92), Vesta and Elisa Rambo's (hereinafter referred to as the "Vesta

Defendants") amended motion for summary judgment (Doc. 102), P&W's response to both

motions (Doc. 108), and Vesta and Elisa Boykin's reply (Doc. 123); (2) P&W's motion to strike

certain expert testimony (Doc. 106) and Vesta and Elisa Rambo's response (Doc. 124); and (3)

P&W's motion to amend its complaint (Doc. 122) and the Cello Defendants' response.  (Doc. 133).  For the reasons stated below, the defendants' motions for summary judgment are GRANTED in part and DENIED in part, P&W's motion to amend its complaint is DENIED, and P&W's motion to strike certain expert testimony is, therefore, MOOT.

## FACTS

Jack Boykin is the chairman of Cello, a company which he formed in 2004 to produce synthetic fuels, and is also the owner of an 80% interest in Boykin Trust.  (Doc. 109-2, p. 25; Doc. 109-3, L. Boykin Dep., p. 5).  He is the husband of Lois Boykin and the father of Elisa Rambo and Allen Boykin.  (Doc. 114-1, L. Boykin Dep., p. 5; Doc. 109-4, J. Boykin Dep., p. 3). He earned a bachelor of science degree in chemical engineering at Auburn University and was awarded an honorary doctorate from Huntingdon College (Doc. 109-2, pp. 16 & 23), but he is not and has never been a licensed professional engineer.  (Doc. 109-5, J. Boykin Dep., pp. 4-5). Following employment by the United States Navy, Jack worked at Monsanto and Ciba-Geigy Corporation and Vertac Corporation, but in the 1970s "went into business for [himself]."  (Doc. 109-2, pp. 23-24).

During the course of Jack's career, Lois has provided loans or advances to Jack or his companies in which he was a principal to "keep those companies going."  (Doc. 107-1, p. 15). The source of those funds is "saved money from businesses that [Jack and Lois] have owned and sold" and "real estate that [Jack and Lois] have sold."  She testified that she did not recall having an ownership interest in any company in which Jack was the principal, other than Boykin Trust or AEL Industries, LLC ("AEL"), but she stated that once the business was sold, Jack would transfer money to both her and him.  (Id., p. 16-17).

In 2005 and 2006, the only income Jack received was social security benefits; however, that income was outweighed by his business losses. (See Doc. 107-14).[1] During that time, Jack had conversations with Caterpillar, Inc. to receive a loan to build a manufacturing plant, but Jack never received such a loan. (Doc. 109-2, pp. 17-18). Meanwhile, Allen Boykin reported less than $30,000 in income on his 2005 and 2006 income tax returns, but "was in somewhat better financial condition" as "there were no judgments against him." (Docs. 107-15 & 108, p. 5).

In February 2007, Jack and Allen, in hopes of having P&W invest in Cello, told P&W's George Landegger and other representatives that they had made commercial quantities of biofuels that met ASTM standards from cellulosic materials at their semi-works plant in Pritchard, Alabama. (Doc. 109-18, Landegger Dep., pp. 3-5; Doc. 109-2, pp. 3 & 5-7). Based on this and other representations, P&W entered into an agreement (the "Option Agreement") on April 19, 2007, to pay Cello $2.5 million for an option to acquire a one-third interest in Cello for an additional $10 million upon production by Cello of commercial quantities of diesel fuel, kerosene and gasoline that met ASTM standards. (Doc. 109-2, pp. 8-9; 11-12; 26-36). On April 26, 2007, P&W made a wire transfer of $2.5 million to Cello. (Doc. 114-4).

On April 24, 2007, Boykin Trust was formed as a limited liability company under the laws of Alabama. At that time, Lois Boykin had an 80% ownership interest in Boykin Trust, Elisa Rambo had a 10% ownership interest, and Allen Boykin, who was also the president and managing partner, had a 10% ownership interest. (Doc. 109-13, pp. 2-3). Boykin Trust is the sole owner of Cello, and the sole asset of Boykin Trust (other than transitory cash balances distributed primarily to family members) is its ownership interest in Cello. (See Doc. 114-3, pp.

---

[1] The plaintiff asserts that at this time, there were also "six unpaid judgments against [Jack] totaling more than $1.9 million." (Doc. 108, p. 5).

9 & 28). The only business of Boykin Trust was to own Cello. (Doc. 114-1, L. Boykin Dep., p. 7). The only address listed for Boykin Trust is a Post Office box, and Boykin Trust did not have a physical address as Lois Boykin performed work for Boykin Trust from her personal residence. (Id., p. 4). Lois Boykin testified that none of the members contributed any capital to Boykin Trust at the time it was formed. (Id., p. 12).[2]

Shortly after receiving the wire transfer from P&W, Cello purchased a 2007 Dodge 2500 and a 2007 Chevy Impala for a total of $63,000, vehicles which Allen Boykin and Jack Boykin drive respectively. (Doc. 114-6, p. 2; Doc. 109-4, J. Boykin Dep., p. 4). Furthermore, Cello began paying Boykin Trust $30,000 per month allegedly as an "engineering fee" for Jack Boykin's services. (Doc. 114-1, L. Boykin Dep., pp. 7-8; Doc. 114-3, p. 13). However, Jack did not receive this money personally, but rather, Boykin Trust paid Lois Boykin a salary of $20,000 per month for writing checks and paying all of the bills. (Doc. 114-1, L. Boykin Dep., pp. 7-8; Doc. 109-3, L. Boykin Dep., p. 3). The payment of salary to Lois began in May 2007 and continued through March 2009. (Doc. 114-1, L. Boykin Dep., pp. 6-7; Doc. 114-3, p. 13).

In addition to the payments to Lois, on or around January 2008, Boykin Trust paid Lois $30,000, Elisa Rambo $20,000, and Allen Boykin $20,000. (Doc. 115-2, p. 2; Doc. 114-1, L. Boykin Dep., pp. 9-10). Initially, those payments were characterized on Boykin Trust's income tax return as loans to partners. (See Doc. 115-3, pp. 5& 8(line 13 is entitled "other assets" and lists $76, 780 and in the attached form, $70,000 is described as "due from partners"); Doc. 115-4, p. 2). At some point thereafter, these payments were reclassified as distributions to the members. (See Doc. 114-5, pp. 4-5). A document entitled "Special Meeting of the Members of

---

[2]   On December 15, 2008, Lois transferred her 80% interest in Boykin Trust to Jack. (Doc. 109-2, p. 20; Doc. 114-5, Hartmann Dep., p. 3).

Boykin Trust, L.L.C" and signed by Lois Boykin, Allen Boykin, and Elisa Rambo states that "[a] special meeting of Boykin Trust, L.L.C. was held on Saturday, December 15, 2007," where they agreed to distribute 42.86% of the profit to Lois, 28.57% to Allen, and 28.57% to Elisa in the same monetary amounts listed above. (Doc. 114-7, p. 20).[3] Similar payments occurred on or around December 2008, when Boykin Trust paid Lois $20,000, Elisa $20,000, and Allen $20,000. (Doc. 115-5, p. 2; Doc. 114-1, L. Boykin Dep., pp. 9-10). The defendants have not provided any documents purporting a special meeting of the members of Boykin Trust authorizing the 2008 distributions. (See Doc. 114-2, Hartmann Dep., p. 16).

Besides paying Boykin Trust $30,000 per month, Cello also began paying Allen Boykin a salary of $15,000 per month within a week of receiving P&W's option payment.[4] (Doc. 115-6, p. 2). Allen Boykin testified that he is the "low man on the totem pole" and that his job duties for Cello initially consisted of finding a site for the construction of a plant, "arranging land clearing, talking to local politicians, electrical folks, ADEM, Volkert on different permitting" and generally "everything in basic standard construction". Allen testified that in 2008, his duties for Cello had been "[h]undred percent... constructing the plant" which specifically involves "putting up buildings, bringing in equipment, unloading equipment, doing dirt work. You know, basic, standard construction process." (Doc. 109-10, A. Boykin Dep., p. 9). Cello also paid Allen a $27,000 bonus in November 2007 and an $18,000 bonus in December 2008. (Doc. 115-

---

[3] P&W points out that "[o]n April 26, 2010, after [P&W's expert Dave] Borden had noted that the distributions were not consistent with the members' respective ownership interests... Boykin Trust produced for the first time as an exhibit" this document. (Doc. 108, pp. 7-8). This court also points out that although this document is signed, it does not have a date next to any of the signatures and it was not signed under penalty of perjury.

[4] Allen received $30,000 on May 31, 2007, and then $15,000 per month thereafter. (Doc. 115-6, p. 2).

6). Allen continues to be paid a salary of $15,000 a month from Cello. (Doc. 109-6, J. Boykin, pp. 12-13). Prior to working for Cello, Allen served as an assistant construction supervisor for the construction of a plant by his family and others for eight months in Mississippi in 1988. He then worked for his father Jack Boykin and also had his own "little water treatment company on the side" which ceased operating after approximately a year. In 1994 through 1999, Allen managed and owned part of a nursery in Montgomery. From 2004 through 2006, he was the "operating or general member" at Forest Technologies and the semi-works plant. (See Doc. 109-10, A. Boykin Dep., pp. 3-7).

In October 2007, Cello wrote two checks for a total of $370,000 ($250,000 on October 17, 2007, and $120,000 on October 30, 2007), but the names of the payees were redacted. (Doc. 114-9). On or around those same dates, Brackin, McGriff, and Johnson, P.C. ("BM&J") reported that it received $250,000 and $120,000 in separate transactions from Cello and placed it into a trust account titled "Boykin, Jack." (Doc. 115-8, p. 2). On its financial statement, Cello noted that it paid a legal retainer of $370,000 which was "being held to negotiate and purchase integral equipment for the plant…" however the identity of the law firm was not identified. (Doc. 114-10, p. 11). In January 2008, BM&J wrote a check for $250,000 to Regions bank, who merged with AmSouth Bank in 2005, with the description "Environ, LLC." (Doc. 115-7, p. 2). Jack Boykin testified that Environ, LLC ("Environ") "was established to do… semi-works" at a semi-works plant. He testified that in 2004, Hurricane Ivan destroyed the semi-works plant and the equipment located in the plant. (Doc. 109-11, J. Boykin Dep., pp. 3-4; Doc. 109-2, p. 19). On November 15, 2005, AmSouth Bank, who provided a loan in relation to the semi-works plant, obtained a judgment against Jack and Environ for $446,000. That judgment was later settled by BM&J on behalf of Jack Boykin, and the equipment, which was being held by Regions

as collateral, was thereafter "purchased" and "used in the plant." (Doc. 109-2, p. 21). Besides paying money to Regions Bank, BM&J also transferred $10,000 on March 24, 2008, from the Jack Boykin Trust Account to Wade B. Perry, Jr. who wrote a letter acknowledging receipt of the money in relation to <u>First American Title v. Jack Boykin</u>, Civil Action No. CV-06-116. He thereafter executed a cancellation of the judgment against Jack. (Doc. 109-14, p. 2; Doc. 115-8, p. 2). Furthermore, in 2009, BM&J transferred $25,000 out of its Jack Boykin trust account as "fees for Allen Boykin Divorce." (Doc. 115-8, p. 3).

P&W asserts that "[t]he Option Agreement prohibited Cello from providing an equity interest or licensing the technology to any investor without first obtaining P&W's permission." (Doc. 108, p. 9). However, in September 2007, Allen Boykin, on behalf of Forest Energy Systems, LLC ("FES") and BioFuels Operating Company, executed a document entitled "Manufacturing and Financing Contract" ("MFC"). (Doc. 109-19, pp. 2 & 19). In the MFC, Biofuels agreed to pay FES a $25 million project fee for the construction of three plants, with a first installment of $12.5 million on the effective date of the contract. (<u>Id.</u>, p. 5). Biofuels also received (1) the exclusive right to operate and manage those plants and any other plants constructed to make use of the technology, (2) 49% of an interim gross profit from each plant for up to 80 years, and (3) the exclusive right to provide financing for any plant. (<u>Id.</u>, pp. 6-7). On September 14, 2007, BioFuels paid Cello $12.5 million via wire transfer.[5] (Doc. 130, J. Boykin Dep., p. 3). Following receipt of the project development fee from BioFuels, Jack Boykin placed the remainder of the P&W option payment into a separate bank account because "we wanted to

_____

[5] P&W cited Tab AT as "Wire Transfer of Funds Statement from BioFuels Operating Company (Cello 17514)" but upon review of the record, Tab AT contains an affidavit of Jason Westbrook. (See Doc. 109-20).

not use the [P&W] funds after we received this payment for the construction of the plant, and so we isolated them and kept them separate as best we could." (Id.).

On October 16, 2007, P&W brought a lawsuit against Cello, Boykin Trust, Jack Boykin, Allen Boykin, and BioFuels and its related companies for injunctive and declaratory relief. (hereinafter referred to as the "Previous Litigation"). (Case No. 07-0743-CG-B, Doc. 1).[6] Also in October 2007, Jack spoke with Elisa Rambo, his daughter, about equipping an analytical lab for the Cello plan so that fuel produced at the plant could be analyzed to determined whether it met ASTM standards. (Doc. 109-8, E. Rambo Dep., p. 10). Jack offered to pay his daughter a fee that was less than others would charge because Jack "felt like that would be a proper fee for her to be paid" since "other labs would have had travel expenses and living time expenses here" and she would not. Elisa accepted this fee without negotiation. (Doc. 109-6, J. Boykin Dep, p. 11).

Elisa has a Ph.D in chemistry from Indiana University, and after receiving her Ph.D, Elisa conducted postdoctoral research in France for the French Government in the field of organic chemistry and botany. (Doc. 98-1, E. Rambo Dep., pp. 6-7). Following her postdoctoral research in France, she performed research for Science International, a company owned by her father, and worked for Forest Technologies, a company owned by her and other family members. (Doc. 109-8, E. Rambo Dep., pp. 3-6). Since 2003 or 2004, Elisa has been a full-time chemistry teacher at the Alabama School of Math and Sciences. (Id., p. 9). Joe Rambo also has a graduate degree and PhD in chemistry and also serves as Dean of Students, as well as a chemistry instructor, at the Alabama School of Math and Sciences. (Doc. 98-2, pp. 23-24).

_____

[6] The complaint was amended on July 31, 2008. (Doc. 158).

Elisa organized Vesta on November 7, 2007, for the purpose of "chemical consulting, formulation, repackaging, and sales." (Doc. 109-15, p. 2; Doc. 98-1). Elisa was a 51% owner of Vesta and her husband, Joe Rambo, owned the other 49%. (Doc. 109-16, p. 3; Doc. 98-1). Elisa testified that she and her husband had discussed starting a business, and when the "opportunity" to consult for Cello "came up", they "used that as an opportunity to springboard our business." (Doc. 98-2, E. Rambo Dep., p. 3). Elisa and her husband drafted a "consulting contract" and provided it to Jack. (Doc. 109-8, E. Rambo Dep., p. 11 & 13; Doc. 98-4). The consulting contract, which was executed on December 28, 2007, provided that Vesta would perform the following work for Cello:

> -develop all analytical procedures necessary to analyze raw materials, fuel product(s) in accordance with ASTM specified analytical procedures and waste stream(s) generated by [Cello's] biofuel manufacturing site;
>
> -purchase on behalf of [Cello] all instrumentation <u>necessary</u> to validate specifications of raw materials, fuel product(s) and waste stream(s);
>
> -prepare manual of analytical procedures for use by on-site technical staff;
>
> -train technical staff on the use of analytical instruments and procedures;
>
> -provide oversight of technical staff following start-up of [Cello's] biofuel manufacturing site;
>
> -provide consultation regarding analytical needs for future business ventures established by [Cello].
>
> (Doc. 109-8, p. 24).

The agreement further provided that Venture would be paid at the rate of $10,000 per month and "a contract start up fee" of $30,000. (<u>Id.</u>). Cello paid Vesta $60,000 on December 28, 2007, and another $30,000 on April 16, 2008. (Doc. 115-10, p. 2-3; Doc. 109-16, p. 3). Cello also paid Vesta $10,000 each on August 13, 2008, September 3, 2008, and October 21, 2008. (Doc. 98-5, p. 1). In its responses to interrogatories, Vesta maintained that

Consulting services were provided to Cello at a rate of $10,000 per month from October 2007 through September 2008.  Project included but was not limited to: Analytical lab design; research and review of appropriate ASTM methods; specification and price negotiation of lab furniture; specification and price negotiation of all analytical lab equipment; coordination of delivery and installation of all lab furniture and equipment; verification of proper installation and function of all lab furniture and equipment; participation in and oversight of all lab consumables necessary for lab start-up; act as analytical lab staff support until lab supervisor hiring (including site visits); and prepare and provide chemical hygiene plan analytical lab.

(Doc. 98-5, p. 2).

Construction on the plant began in early 2008.  In June 2008, Elisa, on behalf of Vesta, received quotes from three cabinet vendors and six equipment vendors.  (See Doc. 115-9).  Elisa ordered cabinets and lab equipment from a total of five vendors.[7]  (Doc. 115-11).  Elisa estimated that the cost of the equipment for the lab was between $250,000 to $350,000 though she testified she did not "know the exact amount."  (Doc. 109-8, E. Rambo, p. 22).  Upon a review of the actual purchase orders and Cello's general ledger as of December 31, 2008, the actual cost of the cabinets and equipment appears to be approximately $150,000.  (See Doc. 115-12, p. 2; Doc. 115-11, p. 6).  After receiving the equipment, Elisa testified that the equipment vendors trained the employees on the lab equipment while she "worked with… the person who came from the companies that did the actual training."  (Doc. 109-8, E. Boykin Dep., pp. 16-17).  Vesta also provided Cello and BioFuels with a lab safety manual entitled "Analytical Chemical Hygiene Plan," that Elisa testified she developed from "experience."[8]  (Id., pp. 18-19 & 26-36).

---

[7] Elisa did not consult with BioFuels with respect to which equipment it wanted at the lab (Doc. 109-8, E. Boykin Dep., p. 15), and in fact, when BioFuels later came on-site to the Cello plant, it brought its own lab with it.  (Doc. 109-631, J. Boykin Dep., p. 9).

[8] Jason Westbrook, a public accountant, testified that after performing a Google search "to determine if the Plan was modeled after other chemical hygiene plans used by unrelated third parties" he discovered "a plan employed by a Utah histology lab, titled 'Chemical Hygiene Plan."  (Doc. 109-20, Westbrook Aff., p.3 & 16).  The plan provided by Elisa includes many (Continued)

Also in 2008, Boykin Trust began to transfer some of the monies it had received from Cello to Forest Technologies, L.L.C.  Forest Technologies is wholly owned by AEL, which is in turn, owned by Lois Boykin, Elisa Rambo, and Allen Boykin, who is also the managing partner. (Doc. 109-12, A. Boykin Dep., p. 3; Doc. 109-8, E. Rambo, pp. 7-8).  In April 2008, Lois Boykin wrote a Boykin Trust check to Forest Technologies for $10,000, followed by a $5,000 check in June 2008, $5,000 in July 2008, $5,000 in August 2008, and $2,000 in January 2009. (Doc. 115-13).  Lois Boykin testified that the above transfers were loans to Forest Technologies but admitted that there were no notes, no interest rate, no repayment dates, and that none of these loans had been repaid by Forest Technologies as of  May 19, 2010.  (Doc. 114-1, L. Boykin Dep., p. 13-14).  In 2007 and 2008, AEL Industries reported it had negative income in both 2007 and 2008.    (Docs. 114-12 & 114-13).

On July 16, 2008, the Boykin Defendants in the Previous Litigation filed a motion for a judgment on the pleadings asking this court to declare the Option Agreement invalid.  (Id., Doc. 146).  P&W asserts that on July 24, 2008, Cello had used all of BioFuels' project development fee, thus it began to use "the P&W option proceeds to pay its debts as they became due" and "consumed substantially all of the $2.5 million option proceeds and interest earnings by the end of October 2008."  (Doc. 114-3, p. 23).  In February 2009, this court ruled in the Previous Litigation that the Option Agreement was void ab initio.  (Case No. 07-0743-CG-B, Doc. 375).  P&W maintains that "[b]y that time, Cello had spent all of P&W's option payment, all of the project development fee, $500,000 more advanced by Biofuels, and was on its way to exhausting

---

identical provisions from the Utah Chemical Hygiene Plan with some additions and deletions. (See Id., pp. 31- 43).

a $950,000 line of credit from Vision Bank." (Doc. 108, pp. 10-11)(citing Doc. 114-3, pp. 23-24).

P&W summarized the alleged benefits the Boykin family has received "[a]s of today" through transfers among the defendants: (1) Allen Boykin has received $695,000 in salary and bonuses from Cello, payments from Boykin Trust, and payments from Cello of divorce attorney fees;[9] (2) Lois Boykin has received $510,000 in salary and distributions from Boykin Trust;[10] (3) Jack Boykin has received $391,000 in judgment payments;[11] (4) Vesta Venture has received $120,000 in payments from Cello; (5) Elisa Rambo has received $40,000 in payments from Boykin Trust; and (6) Forest Technologies has received $27,000 in payments from Boykin Trust. (Id., pp. 14-15).

P&W asserts that at the time all of the above transfers occurred, Cello Energy and Boykin Trust's liabilities exceeded its assets. For the year that ended on December 31, 2007, Cello had total assets of $14,634,975 and total liabilities of $15,045,215. The liabilities included a line item "Deferred revenue" of $12.5 million (Doc. 115-14, p. 6). The "Deferred revenue" line item represents the $12.5 million received from BioFuels for the construction of the first plant. Cello noted in its records that it "will recognize the $12.5 million as revenue upon substantial completion of the plant as agreed upon by both parties which is expected to occur by December

---

[9] $15,000 per month from April 2007 through June 2010, $27,000 Cello bonus in November 2007, $18,000 Cello bonus in December 2008, $20,000 payment from Boykin Trust on Christmas Day 2007, $20,000 payment from Boykin Trust in December 2008, $25,000 legal fees for divorce.

[10] $20,000 per month from May 2007 through March 2009, $30,000 payment on Christmas Day 2007, and $20,000 payment in December 2008.

[11] $250,000 for satisfaction of the AmSouth judgment against Environ and Jack, $10,000 for satisfaction of judgment of First American Title Insurance Company against Jack, and $131,000 for satisfaction of a Vision Bank judgment against Science International and Jack.

31, 2008." (Id., p. 9). The liabilities also included a "Purchase Option" line item for P&W's $2.5 million payment to Cello. (Id., p. 6). Cello noted on the financial statement that "[t]he option could be exercised anytime after the initial payment and before the expiration of 90 days after the refinery being engineered and built in Bay Minette, Alabama, is physically competed and has passed standard ASTM test for the production of fuel oils, diesel fuel oils, and gasoline." (Id., p. 10).

On a balance sheet dated September 30, 2008, Cello had total assets of $13,344,127 and total liabilities of $15,015,579. The liabilities continued to list the $12.5 million "Deferred revenue" line item and the $2.5 "Purchase Option" line item. (Id., p. 14). The "Deferred revenue" line item was thereafter removed from the financial statement for December 31, 2008, lowering Cello's liabilities to $3,815,013. (Id., p. 19). On the June 30, 2009, balance sheet, Cello reported it had total assets of $13,928,467 and total liabilities of $5,142,627. (Id., p. 30). On December 31, 2009, Cello reported that it had $13,176,111 in total assets and $7,453,369 in total liabilities. (Id., p. 35).

In regards to eliminating the $12.5 million "Deferred Revenue" line item, P&W asserts that "[a]lthough Cello treated the plant as completed and operational in 2008 in order to obtain favorable Go-Zone depreciation," the plant never did what it was designed to do (i.e., "produce commercial quantities of biofuel that met ASTM standards from cellulosic materials) and, even if it did, the plant was not completed until March 2009. (Doc. 108, p. 15). Jack Boykin testified that "[t]he plant had basically been finished in March" of 2009. (Doc. 109-6, J. Boykin Dep., p. 3). Cello did not turn the plant over to BioFuels for operation until April 2009, when Jack felt that the plant had been "substantially completed." (Id., p. 3-4 & 14-15), but the plant was returned to Cello on May 26, 2009, as BioFuels determined that "the plant was not ready yet to

be handed over" as "[i]t was still in… pre-commercialization mode."  (Id., p. 4; Doc. 109-22, S. Kaul Dep., pp. 3-4).  A University of Georgia analysis of fuel, which was provided by Cello as having been produced at the plant in February and March 2009, showed that the fuel had no cellulosic content and thus was not made from cellulosic material.  (Doc. 109-2, p. 15).  P&W asserts that "[t]he plant is still incapable of producing commercial quantities of biofuels that meet ASTM standards from cellulosic materials.[12]  (Doc. 108, pp. 15-16).

On June 29, 2009, the jury in the Previous Litigation returned a verdict in favor of P&W and against Cello, Boykin Trust, Jack Boykin, and Allen Boyken, for a total of $10.4 million.  First, the jury found from a preponderance of the evidence that P&W proved its breach of the nondisclosure agreement against Cello and Boykin Trust and awarded P&W $2,827,123.00.  Second, the jury found from a preponderance of the evidence that there was a business relationship between P&W and the Boykin Defendants and that Biofuels and its related parties knew of that business relationship at the time of the alleged interference.  Third, the jury found from a preponderance of the evidence that P&W proved its fraud claim against Cello, Boykin Trust, Jack Boykin and Allen Boykin and awarded P&W $104,437.50, and found by clear and convincing evidence that all four defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to this claim and awarded punitive damages of $7.5 million.  (Doc. 109-1, pp. 2-5).

The last jury award was in connection with the payment by P&W of $2.5 million for an option to acquire a one-third interest in Cello upon proof that a technology that Jack Boykin claimed to have developed for producing biofuels from cellulosic materials actually worked.  In

_____

[12] P&W cites a deposition of Jack Boykin from May 19, 2010.  While "Tab AW" does include a portion of that deposition, it does not include the pages that it cites to this court.

order to induce P&W to pay the $2.5 million, P&W maintained that Jack had told it that he and Allen had made biofuels that met ASTM standards in commercial quantities (over one million gallons) at the semi-works plant in Pritchard, and that there was no reason why they could not do it on a larger scale, and Allen allegedly had confirmed his father's representations. During the course of discovery, P&W asserts that the above four defendants had not made fuel from cellulosic materials in commercial quantities at the semi-works plant and the fuel they claimed to have made subsequently in a plant constructed by Cello (using a portion of P&W's option payment) was in essence fossil-based diesel fuel that they had purchased. (Doc. 108, p. 2).

P&W maintains in the present action that while this fraud was occurring, "Cello and Boykin Trust had transferred hundreds of thousands of dollars to Jack's wife, Lois; Jack's daughter, Elisa; Vesta, an entity in which Elisa was a principal; Forest Technologies, an entity owned indirectly by Lois, Elisa, and Allen; creditor of Jack[] and Allen, and attorneys for Jack and Allen." It purports that "[t]his lawsuit is an effort to recover those transfers, to protect P&W's rights to collect its verdict in the Previous Litigation from each of the defendants, and to hold others who benefit from the defendants' fraud responsible." Thus, "[i]n its complaint, P&W alleges that (i) each of the defendants made or received fraudulent transfers; (ii) Boykin Trust was established for fraudulent purposes, and served as the alter ego of the defendants, and, as a consequence, the organizational veil should be pierced to allow P&W to recover from Boykin Trust's members Lois, Elisa, and Allen; and (iii) Allen has been and continues to be unjustly enriched (to the detriment of P&W) by Cello." (Id.).

## **LEGAL ANALYSIS**

### **I. Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a [trier of fact] to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 524 (11th Cir. 1994)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in [the non-moving party's] pleading; rather, its response .... must − by affidavits or as otherwise provided in this rule − set out specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation and citation omitted).

## II. Alabama Uniform Fraudulent Transfer Act

In its complaint, P&W, as a creditor of Cello, Boykin Trust, Jack Boykin, and Allen Boykin, seeks to have certain transfers of property set aside pursuant to the AUFTA, Ala. Code 1975, § 8-9A-1 et seq., on the theory that the properties had been transferred fraudulently. (See Doc. 1). The AUFTA recognizes two different types of fraudulent transfers: actual fraud and

constructive fraud.  First, § 8-9A-4(a), Ala. Code 1975 allows a creditor to recover a transfer

where the creditor proves actual fraud:

> A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.

> Ala.Code § 8-9A-4(a).

Second, §§ 8-9A-4(c) and 8-9A-5(a) allow a creditor to recover a transfer where the creditor

proves constructive fraud.  Section 8-9-4(c), Ala. Code 1975 states:

> A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor:

>> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

>> (2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Section 8-9A-5(a) states:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.

Insolvency is defined by the AUFTA as (1) "if the sum of the debtor's debts are greater than all

of the debtor's assets at a fair valuation"; or (2) if "a debtor… is generally not paying his debts as

they become due".  Id. § 8-9A-2(a) and (b).  Under the AUFTA, "[a]ssets… do not include

property that has been transferred, concealed, or removed with intent to hinder, delay or defraud

creditors or that have been transferred in a manner making the transfer voidable under this

chapter."  Id. § 8-9A-2(d).

In general, a "creditor" is defined as "[a] person who has a claim" and a "claim" is defined as "[a] right of payment, whether or not the right is reduced to judgment, liquidated, unliquidated, contingent, unmatured, disputed, undisputed, legal, equitable, secured or unsecured…" Id. § 8-9A-1(3) & (4). A "debtor" is defined as "[a] person who is liable on a claim." Id., § 8-9A-1(6). An "insider" includes, which is not a limiting term, the following: (1) if the debtor is an individual, (a) a relative of the debtor or of a general partner of the debtor; (b) a partnership in the which the debtor is a general partner; (c) a general partner in a partnership in which the debtor is a general partner; or a corporation of which the debtor is a director, officer, or person in control; and (2) if the debtor is a corporation, (a) a director of the debtor; (b) an officer of the debtor; (3) a person in control of the debtor; (4) a partnership in which the debtor is a general partner; (5) a general partner in a partnership in which the debtor is a general partner; or (6) a relative of a general partner, director, officer, or person in control of the debtor. Id. § 8-9A-1(8).

### A. Constructive Fraud under Alabama Code § § 8-9A-5 and 8-9A-4(c)

### 1. Cello-to-Boykin Trust Transfers

As stated above, shortly after receiving the wire transfer of $2.5 million from P&W, Cello began paying Boykin Trust $30,000 per month allegedly as an "engineering fee" for Jack Boykin's services. (Doc. 114-1, L. Boykin Dep., pp. 7-8; Doc. 114-3, p. 13). During the period between April 2007 and December 31, 2009, Cello paid Boykin Trust approximately $690,000 for Jack's alleged services. Counts I and III of P&W's complaint seek to avoid these transfers pursuant to § 8-9A-5 and § 8-9A-4(c) respectively and award a judgment in favor of P&W in the amount of the Cello-to-Boykin Trust transfers plus interest. (Doc. 1, pp. 11-14).

The Cello defendants ask this court to grant summary judgment as to these counts because "[t]he undisputed evidence before this Court is that Cello did, in fact, receive reasonably equivalent value in exchange for the Cello to Boykin Trust transfers." (Doc. 93, pp. 7-8). In order to establish claims pursuant § 8-9A-5 and § 8-9A4(c), the plaintiff must show, in part, that Cello did not receive "reasonably equivalent value" in exchange for the $30,000 per month transferred to Boykin Trust. Thus, the question presented here is whether there is no genuine issue as to (1) whether Jack Boykin provided a "value" to Cello; and (2) whether that value was "reasonably equivalent" to the $30,000 per month paid by Cello to Boykin Trust.

The Cello Defendants base their argument on the report of their expert, Xavier Hartmann. In his report, Mr. Hartmann provided:

> On September 1, 2007, Cello and Boykin Trust entered into a Services Agreement. The Agreement called for a monthly fixed fee of $30,000 to be paid to Boykin Trust for engineering services provided to Cello by Jack Boykin. During the period April 2007 through December 31, 2009, consulting fees in the amount of $690,000 were paid by Cello to Boykin Trust. Boykin Trust's equity and income were derived from the consulting fees earned in connection with its Services Agreement with Cello… Jack Boykin developed the technology and was an integral contributor during construction, equipping and implementation of the Bay Minette plant. It was his vision and expertise that created the technology used in the manufacturing process. It is my opinion the compensation received by Boykin Trust for the services provided to Cello by Jack Boykin was not unreasonable given the level of services, knowledge, experience, and expertise provided.
>
> (Doc. 94-1, p. 4)

On the other hand, P&W relies upon its expert David Borden who questioned in his report "whether Jack Boykin provided <u>any</u> value (or was capable of providing any value) for the alleged services rendered… [because] [t]he jury found him guilty of misrepresentation of these and other facts in the verdict reached on June 29, 2009." (Doc. 107-3, p. 13). In other words, "if Jack Boykin fraudulently misrepresented what he had done in terms of manufacturing diesel containing… a cellulosic base and in commercial quantities meeting ASTM specs at the Prichard

facility, then it's questionable to me whether he provided any value, because the fundamental representation he had done this before." (Doc. 95-1, Borden Dep., p. 4). While Mr. Hartmann's analysis may be persuasive to the trier of fact and ultimately victorious at trial, this court finds that a trier of fact could reasonably conclude that Jack Boykin provided no value to Cello since he had fraudulently misrepresented that he had manufactured the technology and in commercial quantities. As there is a genuine dispute as to whether Jack Boykin gave "value" to Cello, summary judgment as to Counts I and III are due to be denied.

### 2. Cello-to-Vesta Transfers

As stated above, Elisa Rambo, on behalf of Vesta, entered into an agreement with Cello which provided that Vesta would be paid at the rate of $10,000 per month and "a contract start up fee" of $30,000 in return for Elisa and her husband's consulting services. (Doc. 109-8, p. 24). Cello ultimately paid Vesta $60,000 on December 28, 2007, another $30,000 on April 16, 2008, (Doc. 115-10, p. 2-3; Doc. 109-16, p. 3), and $10,000 on August 13, 2008, September 3, 2008, and October 21, 2008. (Doc. 98-5, p. 1). Counts IV and VI of P&W's complaint seek to avoid these transfers pursuant to § 8-9A-5 and § 8-9A-4(c) respectively and award a judgment in favor of P&W in the amount of the Cello-to-Vesta transfers plus interest. (Doc. 1, pp. 14-16).

The Cello Defendants and the Vesta Defendants ask this court to grant summary judgment because "the undisputed evidence before this Court is that Cello did receive reasonably equivalent value for the services provided by Vesta…" (Doc. 93, p. 10; see also Doc. 98, p. 11-13). It is undisputed that Vesta provided a "value" to Cello. P&W, however, asserts that there is a genuine dispute as to whether that "value" was "reasonably equivalent" to the $120,000 transferred by Cello. (Doc. 108, pp. 23-26). This court agrees and finds that a trier of fact could

reasonably conclude that the value provided by Vesta was not reasonably equivalent to the $120,000 transfer.

As stated above, Vesta entered into a consulting contract with Cello that stated Vesta would perform certain tasks for Cello.[13]  While it is undisputed that Vesta performed some of the tasks, this court finds that the evidence presents a sufficient disagreement over whether the tasks performed were "reasonably equivalent" to the $120,000 transfer.   For example, while Elisa Rambo measured the laboratory and placed orders for cabinets and equipment, she did not consult with any representative of BioFuels about what equipment the lab should include.  In fact, BioFuels ultimately brought its own lab to the Cello plant.  Furthermore, despite the fact she testified that she "worked with… the person who came from the companies that did the actual training" on the lab equipment  (Doc. 109-8, E. Boykin Dep., pp. 16-17), it is undisputed that she did not personally train any technical staff on the lab equipment.  Lastly, there is a genuine question as to whether Elisa developed the "Analytical Laboratory Chemical Hygiene Plan" plan from her own experience or whether she copied it from a plan employed by a Utah histology lab

---

[13] -develop all analytical procedures necessary to analyze raw materials, fuel product(s) in accordance with ASTM specified analytical procedures and waste stream(s) generated by [Cello's] biofuel manufacturing site;

-purchase on behalf of [Cello] all instrumentation necessary to validate specifications of raw materials, fuel product(s) and waste stream(s);

-prepare manual of analytical procedures for use by on-site technical staff;

-train technical staff on the use of analytical instruments and procedures;

-provide oversight of technical staff following start-up of [Cello's] biofuel manufacturing site;

-provide consultation regarding analytical needs for future business ventures established by [Cello].

entitled Chemical Hygiene Plan. Viewing the evidence in a light most favorable to P&W, this court finds that there are sufficient discrepancies over Vesta's services that require submission to a fact finder, thus summary judgment as to Counts IV and VI is due to be denied.

Vesta alternatively asks this court to grant its motion for summary judgment as to P&W's claim against her under § 8-9A-4(c) because it is barred by a one year statute of limitations as stated in Alabama Code § 8-9A-9(4) and also to grant the motion as to P&W's claim under § 8-9A-5 because P&W's claim did not arise prior to the Boykin Trust-to-Elisa Rambo transfer. (Doc. 98, p. 14-16). Under the AUFTA, an action under § § 8-9A-4(c) and 8-9A-5(a), must be brought "within four years after the transfer was made when the action is brought by a creditor whose claim arose <u>before</u> the transfer was made." Ala.Code § 8-9A-9(3)(emphasis added). Alternatively, an action under § 8-9A-4(c) must be brought "within one year after the transfer was made when the action is brought by a creditor whose claim arose <u>after</u> the transfer was made." <u>Id.</u>, § 8-9A-9(4)(emphasis added). Furthermore, an action under § 8-9A-5(a) can not be brought if the creditor's claim arose after the transfer was made. <u>See</u> Ala. Code § 8-9A-5(a).

The AUFTA defines "creditor" as "[a] person who has a claim." Ala. Code § 8-9A-1(4). A "claim," in turn, is defined as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured…" <u>Id.</u>, § 8-9A-1(3). The Alabama Supreme Court has stated that "[t]he debtor-creditor relationship is created not by a judgment, but by the wrong which produces the injury; and it is the date of the wrongful act, not the date of the filing of the suit or of the judgment, which fixes the status and rights of the parties… Hence, a tort claimant is a creditor, and the alleged tortfeasor is the debtor." <u>Cox v. Hughes</u>, 781 So.2d 197, 201 (Ala. 2000)(quoting <u>Roddam v. Martin</u>, 235 So.2d 654, 656 (Ala. 1970)). In the instant case, the

creditor-debtor relationship between P&W and Cello arose not on the date the jury returned a

verdict in favor of P&W or when P&W filed the instant action, but rather the relationship arose

at the moment that P&W was fraudulently induced to enter into the Option Agreement and pay

the $2.5 million in April 2007.  As stated above, the transfers from Cello to Vesta were made on

December 28, 2007, April 16, 2008, August 13, 2008, September 3, 2008, and October 21, 2008.

Since all the above transfers occurred after April 2007, P&W's claims under § § 8-9A-4(c)

and 8-9A-5(a) is not barred under the AUFTA.

### 3. Cello-to-Jack Boykin Transfer

As stated above in the findings of fact, Cello wrote two checks in October 2007 for a total

of $370,000 to BM&J, who then used $250,000 of these funds to settle a judgment in favor of

AmSouth Bank (now Regions Bank) against Environ and Jack Boykin and who used $20,000 to

satisfy a judgment in favor of First American Title Insurance Company against Jack.  Counts VII

and IX of P&W's complaint seek to avoid these transfers pursuant to § 8-9A-5 and § 8-9A-4(c)

respectively and award a judgment in favor of P&W in the amount of the Cello-to-Jack Boykin

transfers plus interest.  (Doc. 1, pp. 17-19).

The Cello Defendants ask this court to grant summary judgment because "[i]t cannot be

said the funds distributed in an effort to pay a judgment which has been previously been entered

against the Defendant is not 'reasonably equivalent value in exchange.'"  In other words, "[t]he

Baldwin County Circuit Court entered judgment against Environ, LLC and Jack Boykin" thus

"the value of that exchange was calculated by that Court and determined to be reasonable."

Therefore, "[t]he Plaintiff cannot show that the payment of the judgment to a creditor, who had

already reduced their judgment, is without reasonably equivalent value."  (Doc. 93, p. 12).

The Cello Defendants, however, are mistaken as to law. The question presented here is not whether the settlement between Jack Boykin and his two creditors was reasonable, but rather whether Cello, as the debtor, received "value" in exchange for the $260,000 it paid to BM&J to settle the claims against Jack Boykin and Environ. Since the Cello Defendants have not presented any evidence or arguments establishing what "value" Cello received from Jack Boykin, Environ, and/or BM&J in exchange for the $260,000 transfer, summary judgment as to these claims is due to be denied.

### 4. Cello/Boykin Trust-to-Forest Technologies Transfers

As stated above, Boykin Trust transferred some of the monies it had received from Cello to Forest Technologies, which is wholly owned by AEL which in turn is owned by Lois Boykin, Elisa Rambo, and Allen Boykin. (Doc. 109-12, A. Boykin Dep., p. 3; Doc. 109-8, E. Rambo, pp. 7-8). Specifically, in April 2008, Lois Boykin wrote a Boykin Trust check to Forest Technologies for $10,000, followed by a $5,000 check in June 2008, $5,000 in July 2008, $5,000 in August 2008, and $2,000 in January 2009. (Doc. 115-13). Counts X and XII of P&W's complaint seek to avoid these transfers pursuant to § 8-9A-5 and § 8-9A-4(c) respectively and award a judgment in favor of P&W in the amount of the above transfers plus interest. P&W's complaint, however, identifies Cello, rather than Boykin Trust, as the party who transferred the monies to Forest Technology. (Doc. 1, pp. 20 & 22). The Cello Defendants ask this court to dismiss the above counts because of this error. (Doc. 93, p. 12). The plaintiff has filed a motion to amend its complaint attempting to correct this error. (Doc. 122, p. 1).

District courts are required to "enter a scheduling order that limits the time… to amend the pleadings…" Fed.R.Civ.P. 16(b). Such orders "control the subsequent course of the action unless modified by a subsequent order," Fed.R.Civ.P. 16(e), and may be modified only "upon a

showing of good cause." Fed.R.Civ.P. 16(b). Had the plaintiff sought leave to amend its complaint before the scheduling order deadline, the court would look to Rule 15(a) of the Federal Rules of Civil Procedure to determine whether the amendment should be allowed. While leave to amend under Rule 15(a) may be freely given, leave to amend after a scheduling order deadline will only be given upon a showing of "good cause" under Rule 16(b). Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1418 (11th Cir. 1998). "Otherwise, scheduling order deadlines would be 'meaningless' and the good cause requirement articulated by Rule 16(b) would effectively be read out of the Federal Rules of Civil Procedure." Anderson v. Board of School Comm'rs of Mobile County, Ala., 78 F.Supp.2d 1266, 1269 (S.D.Ala. 1999). This "good cause standard… precludes modification of a scheduling order deadline unless [the schedule] cannot 'be met despite the diligence of the party seeking the extension.'" Id.(citations omitted).

This court entered a scheduling order pursuant to Federal Rule of Civil Procedure on November 30, 2009. In that order, this court set a deadline of January 29, 2010, for any party to file a motion for leave to amend any pleadings. (Doc. 20, p. 2). The plaintiff filed a motion to amend its complaint on July 6, 2010, pursuant to Rule 15 of the Federal Rules of Civil Procedure. The plaintiff failed to make any argument concerning "good cause" under Rule 16. (Doc. 122). Since it is the plaintiff's burden and it failed to make any argument as to "good cause," this motion is due to be denied. Regardless, the plaintiff would not be able to establish "good cause" since the plaintiff admits that it had identified the proper nature of the transfers on March 26, 2010, and the plaintiff failed to provide any reason why it failed to file its motion until three months after this date. [14] (Id., p. 3). Furthermore, it is likely that the plaintiff knew the

---

[14] Dave Boren submitted a report wherein he "properly identified that P&W's claims relates to transfers made by Boykin Trust."

proper identification of the parties well before that date.  In light of the foregoing, this court finds that the plaintiff's motion for leave to amend its complaint is due to be denied.

As a result, the plaintiff's complaint identifies Cello as the company that transferred the above monies to Forest Technologies.  (<u>See</u> Doc. 1, p. 8, ¶ 45).  It is undisputed that Cello did not transfer the above monies, but rather Boykin Trust was the company that transferred approximately $25,000 to Forest Technologies.  As a result, Cello is entitled to summary judgment as to Counts X and XII of P&W's complaint.  Furthermore, since Count XI also states that Cello is the party that transferred the above monies to Forest Technologies, Cello is entitled to summary judgment as to that count as well.

### 5. The Boykin Trust Transfers to Lois Boykin, Elisa Rambo, and Allen Boykin

As discussed above, Cello made monthly transfers of $30,000 to Boykin Trust beginning on May 3, 2007.  Boykin Trust in turn transferred part of this money to Lois Boykin, Elisa Rambo, and Allen Boykin.  Specifically, Boykin Trust paid Lois Boykin a salary of $20,000 per month for writing checks and paying all of the bills.  (Doc. 114-1, L. Boykin Dep., pp. 7-8; Doc. 109-3, L. Boykin Dep., p. 3).  The payment of salary to Lois began in May 2007 and continued through March 2009.  (Doc. 114-1, L. Boykin Dep., pp. 6-7; Doc. 114-3, p. 13).  In addition to the payments to Lois, on or around January 2008, Boykin Trust paid Lois $30,000, Elisa Rambo $20,000, and Allen Boykin $20,000.  (Doc. 115-2, p. 2; Doc. 114-1, L. Boykin Dep., pp. 9-10).  Similar payments occurred on or around December 2008, when Boykin Trust paid Lois $20,000, Elisa $20,000, and Allen $20,000.  (Doc. 115-5, p. 2; Doc. 114-1, L. Boykin Dep., pp. 9-10).  Counts XIII and XV of P&W's complaint seek to avoid these transfers pursuant to § 8-9A-5 and § 8-9A-4(c) respectively and award a judgment in favor of P&W in the amount of the Boykin Trust transfers to Lois, Elisa, and Allen, plus interest.  (Doc. 1, pp. 23-25).

The Cello Defendants ask this court to grant summary judgment because "[t]he undisputed evidence in this case is that the distributions by Boykin Trust to its members, while not in line with their respective interest, was consistent with the Articles of Incorporation and letter ratified by a special meeting of the members. Thus, these transfers cannot be fraudulent." (Doc. 93, p. 13). This argument addresses the payments from Boykin Trust to its members in January 2008 and in December 2008 but does not address the wage payments to Lois. It is clear to this court that a genuine dispute exists as to whether Boykin Trust received reasonably equivalent value for its payments of $20,000 per month to Lois. Both P&W's expert and the defendants' expert agree that viewing the facts in a light most favorable to the plaintiff, Lois appears to have been paid "substantially in excess of the value of the services provided." (Doc. 114-3, p. 20; see Doc. 114-2, pp. 6-7). As a result, summary judgment as to this particular transfer is due to be denied.

In regards to the transfers from Boykin Trust to its members in January 2008 and December 2008, it is undisputed that these payments were "not in line with [the member's] respective interest." (Doc. 93, p. 13). Alabama law provides that members of a limited liability company are to receive distributions as provided by the operating agreement or if the operating agreement does not so provide, which in this case it does not, then in proportion to their respective interest. See Ala. Code § 10-12-28. The Cello Defendants attempt to mitigate this problem by claiming that an amended distribution schedule was "ratified by a special meeting of the members." (Doc. 93, p. 13). As to the December 2008 payments, the defendants have not provided any documents purporting a special meeting of the members of Boykin Trust authorizing the 2008 distributions (see Doc. 114-2, Hartmann Dep., p. 16), thus summary judgment as to those transfers is due to be denied. However, as to the January 2008 payments,

the Cello Defendants have provided a document entitled "Special Meeting of the Members of Boykin Trust, L.L.C" and signed by Lois Boykin, Allen Boykin, and Elisa Rambo that states "[a] special meeting of Boykin Trust, L.L.C. was held on Saturday, December 15, 2007," where they agreed to distribute 42.86% of the profit to Lois, 28.57% to Allen, and 28.57% to Elisa.  (Doc. 114-7, p. 20).  This document, however, has a major problem as it does not establish the date it was signed by each party and no one has testified as to the authenticity of the document. Viewing all the facts in a light most favorable to the plaintiff, this court finds that there is sufficient disagreement over this document, thus requiring submission to a trier of fact over whether the January 2008 payments were proper transfers.  Therefore, summary judgment as to those transfers is due to be denied.

Elisa Boykin alternatively asks for this court to grant her motion for summary judgment as to P&W's claim against her under § 8-9A-4(c) because it is barred by a one year statute of limitations as stated in Alabama Code § 8-9A-9(4) and also to grant motion as to P&W's claim under § 8-9A-5 because P&W's claim did not arise prior to the Boykin Trust-to-Elisa Rambo transfer.  (Doc. 98, p. 18).  Under the AUFTA, an action under § § 8-9A-4(c) and 8-9A-5(a), must be brought "within four years after the transfer was made when the action is brought by a creditor whose claim arose <u>before</u> the transfer was made."  Ala.Code § 8-9A-9(3)(emphasis added).  Alternatively, an action under § 8-9A-4(c) must be brought "within one year after the transfer was made when the action is brought by a creditor whose claim arose <u>after</u> the transfer was made."  <u>Id.</u>, § 8-9A-9(4)(emphasis added).  Furthermore, an action under § 8-9A-5(a) can not be brought if the creditor's claim arose after the transfer was made.  <u>See</u> Ala. Code § 8-9A-5(a).

The AUFTA defines "creditor" as "[a] person who has a claim." Ala. Code § 8-9A-1(4). A "claim," in turn, is defined as "[a] right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured…" Id., § 8-9A-1(3). The Alabama Supreme Court has stated that "[t]he debtor-creditor relationship is created not by a judgment, but by the wrong which produces the injury; and it is the date of the wrongful act, not the date of the filing of the suit or of the judgment, which fixes the status and rights of the parties… Hence, a tort claimant is a creditor, and the alleged tortfeasor is the debtor." Cox v. Hughes, 781 So.2d at 201 (Ala. 2000)(citation omitted). In the instant case, the creditor-debtor relationship between P&W and Boykin Trust arose not on the date the jury returned a verdict in favor of P&W or when P&W filed the instant action, but rather the relationship arose at the moment that P&W was fraudulently induced to enter into the Option Agreement and pay the $2.5 million in April 2007. Since the January 2008 and December 2008 transfers occurred after April 2007, P&W's claims under § § 8-9A-4(c) and 8-9A-5(a) are not barred under the AUFTA.

### 6. The Cello-to-Allen Boykin Transfers

As discussed above, besides paying Boykin Trust $30,000 per month, Cello also began paying Allen Boykin a salary of $15,000 per month,[15] (Doc. 115-6, p. 2) a payment which he continues to receive to this day. (Doc. 109-6, J. Boykin, pp. 12-13). Cello also paid Allen a $27,000 bonus in November 2007 and a $18,000 bonus in December 2008. (Doc. 115-6).

---

[15] Allen received $30,000 on May 31, 2007, and then $15,000 per month thereafter. (Doc. 115-6, p. 2).

Lastly, in 2009, BM&J transferred $25,000 out of its Jack Boykin trust account[16] "for Allen Boykin Divorce." (Doc. 115-8, p. 3). Counts XVI and XVIII of P&W's complaint seek to avoid these transfers pursuant to § 8-9A-5 and § 8-9A-4(c) respectively and award a judgment in favor of P&W in the amount of the Cello-to-Allen Boykin transfers plus interest. (Doc. 1, pp. 26-28).

The Cello Defendants ask this court to grant summary judgment because "the undisputed evidence before this Court is that Cello received reasonably equivalent value in exchange for the services provided by Allen Boykin". (Doc. 93, pp. 14-15). The Cello Defendants base their argument on the fact that Mr. Hartmann opined that the compensation for Allen's services "is not unreasonable given the nature of his work" including the oversight and management of plant construction and on the fact that Mr. Borden "could not testify as to whether Allen Boykin's compensation was reasonable or not." (Id., p. 14). However, the question presented here is not just whether the value of Allen's services was "reasonably equivalent" to the total transfers paid by Cello to Allen but also whether Allen provided a "value" through his services to Cello. Like his analysis of Jack Boykin's services, Mr. Borden opined that if Allen had misrepresented his knowledge, experience and expertise in constructing a plant that could produce commercially viable cellulosic fuel, Allen's services, like Jack's services, would have had no value to Cello. See (Doc. 107-8, Borden Dep., p. 11)("Well, the value of Jack Boykin's services is based upon the jury's finding that he misrepresented, fraudulently, his background and experience in the Prichard facility. Same thing with Allen's."); Doc. 107-3, p. 18("It is unclear at this time what value was provided by the services of Allen Boykin to Cello. In the Previous Litigation, the jury found Cello, Boykin Trust, Jack Boykin, and Allen Boykin guilty of fraud regarding the ability

---

[16] As discussed previously, in October 2007, Cello wrote two checks to BM&J for a total of $370,000 and BM&J formed the Jack Boykin Trust account, a fund which BM&J used in part to settle judgments against Jack Boykin and also to fund Allen's divorce.

to produce fuel containing cellulosic materials, placing substantial doubt on the value of the services provided by Allen Boykin."). Viewing the facts in a light most favorable to the plaintiff, this court finds that a trier of fact could reasonably conclude that Allen Boykin provided no value to Cello. Therefore, summary judgment as to Counts XVI and XVIII are due to be denied.

## B. Actual Fraud under Alabama Code § 8-9A-4(a)

Counts II, V, VIII, XIV, and XVII of P&W's complaint seek to avoid the above transfers pursuant to § 8-9A-4(a) and award a judgment in favor of P&W in the amount of each of the above transfers plus interest. (Doc. 1). As stated above, section 8-9A-4(a) provides that:

> A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.

Ala.Code § 8-9A-4(a).

In determining "actual intent," the AUFTA provides a non-exclusive list of factors or "badges of fraud" that a trier of fact may consider: (1) whether the transfer was to an insider; (2) whether the debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer was disclosed or concealed; (4) whether before the transfer was made, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made; (10) whether the transfer occurred shortly before or after a substantial debt was incurred; and (11) whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Id., § 9-9A-4(b).

It is undisputed that the transfers from Cello to Boykin Trust, from Cello to Jack Boykin, from Boykin Trust to Lois, Elisa, and Allen, and from Cello to Allen were all transfers to an insider (Factor #1) and were made after the debtor had been sued or threatened with suit (Factor #4). Furthermore, there is a genuine dispute as to whether those transfers and the transfers from Cello to Vesta were concealed (Factor #3), whether the value of the consideration received by the debtor was "reasonably equivalent to the value of the asset transferred" (Factor #8), whether the debtor was insolvent or became insolvent after the transfer was made (Factor #9), and whether the transfer occurred shortly before or after a substantial debt was incurred (Factor #10).

The defendants argue that since Mr. Hartmann weighed these factors and opined "that Cello's transfers…. were not made with actual intent to hinder, delay or defraud any creditors of Cello or Boykin Trust" and since Mr. Borden did not give a differing opinion, P&W lacks evidence to create a genuine issue of material fact. (Doc. 93, pp. 15-16). The defendants, however, misunderstand the role of this court in determining a motion for summary judgment. In his report, Mr. Hartmann attempts to weigh the above factors and render an opinion as to whether those factors show "actual intent"; however, it is not the duty of this court "to weigh the evidence and determine the truth of the matter…" Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. Rather, the duty of this court is "to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. at 249. There is no de facto rule establishing how many factors must be met in order to find, or not find, actual fraud. Kipperman v. Onex Corp., slip op., 2010 WL 761227, at *4 (N.D.Ga. Mar. 2, 2010) ("[t]here is no magic formulation. One badge may be enough; many badges may not be enough."). In other words, a plaintiff is not required to prove every badge of fraud to refute a motion for summary judgment, but rather, the

plaintiff must merely make a sufficient showing of genuine dispute of fact. Mize v. Jefferson City Bd. of Education, 93 F.3d 739, 742 (11th Cir. 1996).

Six "badges of fraud" are either present or at issue in this case. While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, several of them when considered together may afford a basis to infer fraud. Viewing the facts in a light most favorable to the plaintiff, this court finds that a trier of fact could reasonably conclude that the debtors made the above transfers with actual intent to hinder, delay, or defraud P&W. Therefore, summary judgment is due to be denied as to Counts II, V, VIII, XIV, and XVII.

The Vesta Defendants alternatively assert that summary judgment should be granted as to the Cello-to-Vesta Venture transfers (Count V) because Vesta took the money in good faith and for reasonably equivalent value. (Doc. 98, p. 11). Section 8-9A-8(a) provides that "[a] transfer is not voidable under Section 8-9A-4(a) against a person who took in good faith and for a reasonably equivalent value…" Ala. Code § 8-9A-8(a). For the same reasons stated supra in regards to constructive fraud, this court finds that there is a genuine dispute as to whether Cello received reasonably equivalent value from Vesta's services. In sum, this court found supra that viewing all evidence in the light most favorable to P&W and resolving all reasonable doubts about the facts in its favor, the evidence presents a sufficient disagreement to require submission to a trier of fact. The Court of Appeals for the Eleventh Circuit has instructed that "[i]f reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Miranda, 975 F.2d at 1534(citation omitted). Therefore, summary judgment as to Count V is due to be denied.

### III. Unjust Enrichment of Allen Boykin

In Count IXX [sic][17] of its complaint, P&W asserts that "[a]s a result of the fraudulent scheme orchestrated in part by Allen Boykin, Allen Boykin has been unjustly enriched at the expense of and to the detriment and harm of creditors such as P&W" and asks this court to enter an order "awarding judgment in favor of P&W against Allen Boykin in an amount to be determined by the trier of fact to compensate P&W for its damages resulting from Allen Boykin's unjust enrichment…" (Doc. 1, p. 29).   The Alabama Supreme Court has stated "[t]o prevail on a claim of unjust enrichment, the plaintiff must show that the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendants because of mistake or fraud… The success of a claim for unjust enrichment depends on the particular facts and circumstances of each case." Atlantic National Trust, LLC v. McNamee, 984 So.2d 375, 381 (Ala. 2007)(quoting Scrushy v. Tucker, 955 So.2d 988, 1011-1012 (Ala. 2006)(quotation marks omitted).

In their brief, the Cello Defendants argue that there is no evidence of unjust enrichment since "[p]ayments made to Allen Boykin were reasonably equivalent value [sic] in exchange for the services provided as an employee of Cello" and since "the distributions to Allen Boykin from Boykin Trust were not in violation of the Articles of Incorporation of Boykin Trust, and though now in proportional to him [sic] membership interest, were ratified by a special meeting of the members." (Doc. 93, p. 18).  For the same reasons stated supra in regards to constructive notice, this court finds that there is sufficient disagreement requiring submission to a trier of fact over whether the distributions paid to Allen were proper transfers and finds that a trier of fact could reasonably conclude that Allen Boykin as an employee of Cello provided no value to Cello since he allegedly misrepresented his knowledge, experience and expertise in constructing a plant that

---

[17] The next numbered count should be XIX.

could produce commercially viable cellulosic fuel.  Therefore, summary judgment is due to be denied as to Count IXX [sic].

### IV. Piercing the Corporate Veil

In Count XX of its complaint, P&W assert that "[d]ue to the conduct of Lois Boykin, Allen Boykin and Elisa Rambo, the corporate veil of Boykin Trust is pierced and Lois Boykin, Allen Boykin and Elisa Rambo are personally liable for the indebtedness owed to P&W by Boykin Trust", thus P&W asks this court to "enter an order awarding damages in favor of P&W against Lois[], Allen[], and Elisa[], jointly and severally, to the extent necessary to satisfy the claim of P&W against Boykin Trust and awarding such other or different relief as the Court deems proper and just."  (Doc. 1, pp. 30-31).  Relying  upon the case Ex parte Thorn, 788 So.2d 140 (Ala. 2000), the Cello Defendants ask this court to grant summary judgment as to this claim because "piercing the corporate veil will not support a cause of action."  (Doc. 93, pp. 17-18).  However, the defendants' reliance upon this case is misplaced.  In Thorn, the Alabama Supreme Court did not find that the plaintiff can altogether not proceed on a cause of action for piercing the corporate veil, but rather, the court found that a plaintiff is not entitled to a jury determination of that claim.  Id. at 145.   Instead, the Alabama Supreme Court stated that "the trial court must dispose of [the piercing-the-corporate-veil doctrine] without a jury" after the "factual questions that are purely legal in nature, as well as those common to the legal and equitable issues" are first "decided by the jury."  Id.  In light of the foregoing, summary judgment as to Count XX is due to be denied.

### CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, it is **ORDERED** that the Cello Defendants' motion for summary judgment (Doc. 92) and the Vesta

Defendants' amended motion for summary judgment (Doc. 102) are **GRANTED** as to Counts X, XI, and XII and **DENIED** as to all other counts in the plaintiff's complaint; that P&W's motion for leave to amend its complaint (Doc. 122) is **DENIED**; and that P&W's motion to strike certain expert testimony (Doc. 106) is therefore **MOOT**.

**DONE and ORDERED** this 24th day of August, 2010.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE
