IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PARSONS & WHITTEMORE ENTERPRISES CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 09-631-CG-B |
| CELLO ENERGY, LLC, et al., | ) ) | |
| Defendants, | ) ) | |

## ORDER

On September 25, 2009, Parsons and Whittemore Enterprises Corporation ("P&W") brought a lawsuit against Cello Energy, LLC ("Cello"), Boykin Trust, LLC ("Boykin Trust"), Vesta Venture, L.L.C. ("Vesta"), Forest Technologies, LLC ("Forest Technologies"), Jack W. Boykin ("Jack Boykin"), Lois Anne Cowin Boykin ("Lois Boykin"), Allen Boykin, and Elisa Boykin Rambo ("Elisa Rambo") pursuant to the Alabama Uniform Fraudulent Transfer Act ("AUFTA") to "avoid and/or to prevent fraudulent transfers made and proposed to be made by and among members of the Boykin Family and entities they control." (Doc. 1, p. 1). All of the defendants denied the claimant's allegations. (Docs. 5-10, 13). On August 24, 2010, this court granted the defendants' motions for summary judgment as to P&W's claims against Forest Technologies. (Doc. 156). On September 27, 2010, this court granted a joint motion to dismiss P&W's claims against Vesta and Elisa Rambo. (Docs. 163 & 164). A bench trial was held on P&W's remaining claims; testimony was taken and other evidence was received in this matter on September 27, 2010, September 28, 2010, and September 29, 2010. On October 21, 2010, P&W

1

filed a notice of a bankruptcy filing by Cello. On October 25, 2010, P&W filed a notice of a bankruptcy filings by Boykin Trust and Jack Boykin. Upon consideration of all evidence presented, and for the reasons stated herein, this court finds that this action is due to be stayed as to Counts I, II, III, VII, VIII, IX, XIII, XIV, XV, XVI, XVII, XVIII, XX and XXI, and that P&W is entitled as to Count IXX [sic][1] to a net claim of $695,000 from Allen Boykin.

## BACKGROUND

Jack Boykin is the chairman of Cello, a company which he formed in 2004 to allegedly produce synthetic fuels, and since June 2010, has been the sole owner of Boykin Trust. He is the husband of Lois Boykin and the father of Elisa Rambo and Allen Boykin. He earned a bachelor of science degree in chemical engineering at Auburn University and was awarded an honorary doctorate from Huntingdon College, but he is not and has never been a licensed professional engineer. Prior to starting Cello, Jack has been a principal in several entities that had failed. First, Wesley Industries, a company that Jack formed to make pesticides and herbicides, filed for bankruptcy. Second, Jack closed Science International, LLC ("Science International"), a company which he founded in the early 2000s. Third, Environ, LLC ("Environ"), a company which assembled and operated a semi-works plant in Prichard that Jack and Allen claimed made commercial quantities of synthetic fuel, went out of business.

In 2005, Jack Boykin's only income was $16,500 in social security benefits. Similarly, in 2006, Jack's only income was social security benefits totaling $21,198. This income was far outweighed by his business losses. For example, as of July 2006, there were six unpaid judgments against Jack totaling more than $1.9 million: (1) Colonial Bank received a judgment of $777,077.98 on March 30, 2004; (2) SunTrust Bank received a judgment of $178,820.00 on

---

[1] The next numbered count should be XIX.

September 28, 2004; (3) Altec Capital received a judgment of $305,830.08 on October 13, 2004; (4) Vision Bank received a judgment of $94,590.26 on September 19, 2005; (5) AmSouth Bank received a judgment of $446,820.89 on November 15, 2005; and (6) First American Title Insurance Company received a judgment of $122,977.83 on July 6, 2006. Allen Boykin reported $60,000 of taxable income on his 2004 income tax return, $28,000 of taxable income on his 2005 tax return, and $30,123 on his 2006 income tax return.

In February 2007, Jack and Allen, in hopes of having P&W invest in Cello, told P&W's George Landegger and other representatives that they had made commercial quantities of biofuels that met ASTM standards from cellulosic materials at their semi-works plant in Prichard, Alabama. Based on this and other representations, P&W entered into an agreement (the "Option Agreement") on April 19, 2007, to pay Cello $2.5 million for an option to acquire a one-third interest in Cello for an additional $10 million upon production by Cello of commercial quantities of diesel fuel, kerosene and gasoline that met ASTM standards. On April 26, 2007, P&W made a wire transfer of $2.5 million to Cello.

On April 24, 2007, Boykin Trust was formed as a limited liability company under the laws of Alabama. At that time, Lois Boykin had an 80% ownership interest in Boykin Trust, Elisa Rambo had a 10% ownership interest, and Allen Boykin, who was also the president and managing partner, had a 10% ownership interest. Boykin Trust is the sole owner of Cello, and the sole asset of Boykin Trust (other than transitory cash balances distributed primarily to family members) is its ownership interest in Cello. The only business of Boykin Trust was to own Cello. The only address listed for Boykin Trust is a Post Office box, and Boykin Trust did not have a physical address as Lois Boykin performed work for Boykin Trust from her personal

residence. None of the members contributed any capital to Boykin Trust at the time it was formed.

Shortly after receiving the wire transfer from P&W, Cello purchased a 2007 Dodge 2500 and a 2007 Chevy Impala for a total of $63,000, vehicles which Allen Boykin and Jack Boykin drive respectively. Furthermore, within days of Cello's receipt of P&W's option payment, Cello began paying Boykin Trust $30,000 per month, purportedly for engineering consulting services provided by Jack. The $30,000 monthly payments continued through March 2009, and in January 2010, Cello made a last $10,000 payment to Boykin Trust. The total amount transferred by Cello to Boykin Trust for the alleged engineering consulting services was $700,000. Jack, however, did not receive this money personally, but rather, Boykin Trust paid Lois Boykin a salary of $20,000 per month for writing checks and paying all of the bills. The payment of salary to Lois began in May 2007 and continued through March 2009 for a total of $460,000. Lois, in turn, paid for the maintenance of the house in which she and Jack lived, his food and clothing, and insurance deductibles for his heath care.

When asked at trial what services Lois had performed in exchange for the $20,000 monthly payments, Jack and Lois testified from a prepared list that she had performed the following services: writing checks and dealing with the accounting firm, coordinating visits of dignitaries to Cello's facilities, assisting with the design of the Cello office building, decorating and furnishing the Cello office building, decorating Cello's lab and production building, break room and guard house, baking cookies and cakes, accompanying her husband Jack on trips, maintaining the lawn at her home and taking a picture of a tanker leaving Cello's plant. However, in previous depositions, Lois testified that she did not perform any services for that salary and that if she did perform services, she only wrote checks and paid bills. Concerning this

4

discrepancy from her deposition testimony, Lois stated that she was only asked about the services she had performed for Boykin Trust and not for Cello. Lois admitted, however, that she received no payment from Cello for the alleged services she provided to Cello.[2] She further testified that the reason she ultimately received a check in the amount of $20,000 per month from Boykin Trust was so she could maximize her social security benefits.[3]

In addition to the payments to Lois, in or around January 2008, Boykin Trust paid Lois $30,000, Elisa Rambo $20,000, and Allen Boykin $20,000. Initially, those payments were characterized on Boykin Trust's income tax return as loans to partners, but at some point thereafter, these payments were reclassified as distributions to the members. A document was provided to this court entitled "Special Meeting of the Members of Boykin Trust, L.L.C" and signed by Lois Boykin, Allen Boykin, and Elisa Rambo. This document states that "[a] special meeting of Boykin Trust, L.L.C. was held on Saturday, December 15, 2007," where they agreed to distribute 42.86% of the profit to Lois, 28.57% to Allen, and 28.57% to Elisa in the same monetary amounts listed above. According to Lois, however, a physical meeting did not take place, but rather, she "more than likely" talked to Elisa and Allen individually. She testified that she decided how much she wanted to "share with [her] children" and established that figure as the amount of the distribution rather than an amount pursuant to their respective ownership

---

[2] Cello employed Elani Tsaltas to pay its bills, handle travel arrangements, coordinate meetings, answer the telephone, maintain all accounting records for Cello, maintain communications with suppliers of Cello and write all correspondence for Cello not personally written by Jack. Ms. Tsaltas was paid $6,000 to $7,000 per month.

[3] Jack also testified that Lois contributed office furniture and equipment to Cello with a value of "at least $70,000 to $80,000." However, a tax asset detail prepared by Cello's accountant valued Cello's office furniture and equipment at $15,846.70 in 2008, and Lois testified that she did not purchase any of the office equipment listed on the tax asset detail. Furthermore, the defendants did not identify the specific furniture and equipment that she allegedly provided.

interests. Lois further testified that the above document was prepared by Xavier Hartmann, the defendants' accountant, and Mr. Hartmann testified that the document was not created until after April 2008, and that it was a "post hoc justification" for varying the percentages of the distributions made to Lois, Allen, and Elisa. Similar payments occurred in or around December 2008, when Boykin Trust paid Lois $20,000, Elisa $20,000, and Allen $20,000. The defendants did not provide any documentation purporting a special meeting of the members of Boykin Trust authorizing the 2008 distributions.

Besides paying Boykin Trust $30,000 per month, Cello also began paying Allen Boykin a salary of $15,000 per month as purported compensation for overseeing the construction of the Bay Minette facility within a week of receiving P&W's option payment.[4] Allen testified that he "was asked if I would construct the facility and explained this would be my salary and I said yes and I said thank you and I took it."[5] Cello also paid Allen a $27,000 bonus in November 2007 and an $18,000 bonus in December 2008. (Doc. 115-6). Allen continues to be paid a salary of $15,000 a month from Cello. (Doc. 109-6, J. Boykin, pp. 12-13).[6]

---

[4] Allen received $30,000 on May 31, 2007, and then $15,000 per month thereafter. (Doc. 115-6, p. 2). This salary was approximately three times what he was paid in 2004 when he worked for Environ, LLC to assemble and operate a semi-works plant in Prichard and approximately six times what he had earned in 2005 and 2006 when he worked for AEL Industries, another family company, after consideration of losses incurred in that business.

[5] Allen earned a history degree from Huntington College, and he is not and has never been a licensed professional engineer.

[6] Prior to working for Cello, Allen served as an assistant construction supervisor for the construction of a plant by his family and others for eight months in Mississippi in 1988. He then worked for his father, Jack Boykin, and also had his own water treatment company on the side which ceased operating after approximately a year. In 1994 through 1999, Allen managed and owned part of a nursery in Montgomery. From 2004 through 2006, he was the operating or general member at Forest Technologies and the semi-works plant.

In October 2007, Cello wrote two checks for a total of $370,000 to the law firm, Brackin, McGriff, and Johnson, P.C. ("BM&J"), who then placed the money into a trust account titled "Boykin, Jack." On its financial statement, Cello noted that it paid a legal retainer of $370,000 which was "being held to negotiate and purchase integral equipment for the plant…" however the identity of the law firm was not identified. In January 2008, BM&J wrote a check for $250,000 to Regions Bank, which merged with AmSouth Bank in 2005, to satisfy AmSouth Bank's judgment against Environ and Jack Boykin. Jack testified that in return for the $250,000 payment, Cello acquired equipment from Regions that had been repossessed when the note underlying the judgment went into default. Jack, however, did not provide any documentation, such as a bill of sale, in support of this testimony. He also testified that the plant at which the equipment was located and some of the equipment were damaged by flood waters in 2004 from Hurricane Ivan. Moreover, BM&J also transferred $10,000 on March 24, 2008, from the Jack Boykin Trust Account to settle First American Title v. Jack Boykin, Civil Action No. CV-06-116.

Furthermore, in 2009, BM&J transferred $25,000 out of its Jack Boykin trust account as "fees for Allen Boykin Divorce." Jack testified that it was possible that Allen's divorce was funded from money that Lois had paid to BM&J, and Lois clarified that all monies paid by her to BM&J were "for other things we might need for the company." However, the BM&J trust account does not show a payment from Lois prior to the payment for Allen's divorce, and although she testified that she would bring a cancelled check to court that showed that she made a $50,000 payment to the BM&J trust account, she did not produce the said document.[7]

---

[7] in regard to all the above transfers, several of the defendants in 2008 and 2009 allegedly loaned money back to Cello. Lois Boykin loaned Cello from May 2009 to November 2009 (Continued)

7

The Option Agreement allegedly prohibited Cello from providing an equity interest or licensing the technology to any investor without first obtaining P&W's permission. However, in September 2007, Allen Boykin, on behalf of Forest Energy Systems, LLC ("FES") and BioFuels Operating Company, executed a document entitled "Manufacturing and Financing Contract" ("MFC"). In the MFC, Biofuels agreed to pay FES a $25 million project fee for the construction of three plants, with a first installment of $12.5 million on the effective date of the contract. Biofuels also received (1) the exclusive right to operate and manage those plants and any other plants constructed to make use of the technology, (2) 49% of an interim gross profit from each plant for up to 80 years, and (3) the exclusive right to provide financing for any plant. On September 14, 2007, BioFuels paid Cello $12.5 million via wire transfer. Following receipt of the project development fee from BioFuels, Jack Boykin placed the remainder of the P&W option payment into a separate bank account

On October 16, 2007, P&W brought a lawsuit against Cello, Boykin Trust, Jack Boykin, Allen Boykin, and BioFuels and its related companies for injunctive and declaratory relief. (hereinafter referred to as the "Previous Litigation"). (Case No. 07-0743-CG-B, Doc. 1).[8] Construction on the new Cello plant began shortly thereafter in early 2008. On July 16, 2008, the Boykin Defendants in the Previous Litigation filed a motion for a judgment on the pleadings

---

$163,550 and Cello repaid approximately $95,500 of that said loan. JWB Associates LLC loaned Cello $19,465 from May 2009 to June 2009 and approximately $2,000 of that loan was repaid. Boykin Trust loaned Cello $99,000 from April 2009 to June 2009 and none of that money has been repaid. Jack Boykin had loaned Cello in May 2009, $500, all of which was allegedly repaid. Lois Boykin had loaned $65,000 and $5,000 in April and July 2009 respectively and Boykin Trust had loaned $27,000 from April 2008 to January 2009, and none of these loans had been repaid. The defendants have not provided this court with any documentation of any promise to repay, interest charge, or maturity date.

[8] The complaint was amended on July 31, 2008. (Doc. 158).

asking this court to declare the Option Agreement invalid. (Id., Doc. 146). On July 24, 2008, Cello had used all of BioFuels' project development fee, thus it began to again use the P&W option proceeds to pay its debts as they became due. In February 2009, this court ruled in the Previous Litigation that the Option Agreement was void ab initio. (Case No. 07-0743-CG-B, Doc. 375). By that time, Cello had spent all of P&W's option payment, all of the project development fee of $12.5 million, $500,000 more advanced by BioFuels, and was currently using a $950,000 line of credit from Vision Bank.

For the year that ended on December 31, 2007, Cello had total assets of $14,634,975 and total liabilities of $15,045,215. The liabilities included a line item "Deferred revenue" of $12.5 million. The "Deferred revenue" line item represents the $12.5 million received from BioFuels for the construction of the first plant. Cello noted in its records that it "will recognize the $12.5 million as revenue upon substantial completion of the plant as agreed upon by both parties which is expected to occur by December 31, 2008." The liabilities also included a "Purchase Option" line item for P&W's $2.5 million payment to Cello. Cello noted on the financial statement that "[t]he option could be exercised anytime after the initial payment and before the expiration of 90 days after the refinery being engineered and built in Bay Minette, Alabama, is physically completed and has passed standard ASTM test for the production of fuel oils, diesel fuel oils, and gasoline."

On a balance sheet dated September 30, 2008, Cello had total assets of $13,344,127 and total liabilities of $15,015,579. The liabilities continued to list the $12.5 million "Deferred revenue" line item and the $2.5 "Purchase Option" line item. The "Deferred revenue" line item was thereafter removed from the financial statement for December 31, 2008, lowering Cello's liabilities to $3,815,013. On the June 30, 2009, balance sheet, Cello reported it had total assets

9

of $13,928,467 and total liabilities of $5,142,627. On December 31, 2009, Cello reported that it had $13,176,111 in total assets and $7,453,369 in total liabilities.

Although the December 31, 2008, balance sheet indicated that the new Cello plant was substantially completed by the end of 2008, Allen testified that the construction of the plaint was not completed until some time in February or March 2009. In fact, Cello did not turn the plant over to BioFuels for operation until April 2009, but the plant was returned to Cello on May 26, 2009, as BioFuels determined that the plant was not ready yet to be handed over as it was still in pre-commercialization mode. Samir Kaul of BioFuels testified that he did not believe that the new Cello plan was capable between April 1, and May 29, 2009, of producing cellulosic fuel in commercial quantities that would meet ASTM standards. Allen Boykin admitted that the new Cello plant has failed to generate enough income to cover expenses. Over the approximately 18 months since its alleged completion, Cello's plant has generated approximately $17,000 in revenues.

On June 29, 2009, the jury in the Previous Litigation returned a verdict in favor of P&W and against Cello, Boykin Trust, Jack Boykin, and Allen Boyken, for a total of $10.4 million. First, the jury found from a preponderance of the evidence that P&W proved its breach of the nondisclosure agreement against Cello and Boykin Trust and awarded P&W $2,827,123.00. Second, the jury found from a preponderance of the evidence that there was a business relationship between P&W and the Boykin Defendants and that Biofuels and its related parties knew of that business relationship at the time of the alleged interference. Third, the jury found from a preponderance of the evidence that P&W proved its fraud claim against Cello, Boykin Trust, Jack Boykin, and Allen Boykin and awarded P&W $104,437.50, and found by clear and convincing evidence that all four defendants consciously or deliberately engaged in oppression,

fraud, wantonness, or malice with regard to this claim and awarded punitive damages of $7.5 million. (Doc. 109-1, pp. 2-5). With regards to the punitive damages award, this court had previously concluded that:

> The evidence before the jury established a pattern of intentional misconduct on the part of the Boykin Defendants leading to repeated damage to P&W. This misconduct included making one or more false statements or promises including that the defendants had previously produced one or two million gallons of fuel using the Technology with feedstock that included cellulosic materials; that they possessed test results documenting the fuel had met ASTM standards; that they had properly filed patent applications protecting the Technology; that they had ability to fund the balance necessary for financing the construction costs and working capital needs of the Bay Minette plant beyond the $2.5 million invested by P&W; that they would use the $2.5 million only for construction of the Bay Minette plant; that Cello would provide full and transparent disclosure of the Technology; and that they would engage P&W to provide services and expertise during design and construction of the plant. Additionally, there is no question that the harm to P&W was the result of intentional malice, trickery, or deceit by the Boykin Defendants…
>
> The Boykin Defendants did not sell petroleum goods to P&W, but rather, they fraudulently misrepresented that they could make a specific type of petroleum with non-existent Technology in hopes of inducing P&W to engage in a multi-million dollar transaction.
>
> (See Case No. 07-743, Doc. 593, pp. 7 & 9).

In November 2009, Cello paid approximately $131,304.77 to Vision Bank to satisfy a judgment against Science International and Jack. At the same time, Cello paid approximately $8,617.40 to Vision Bank to extinguish a line of credit in favor of JWB Associates, LLC, an entity which is solely owned by Jack. Furthermore, since the jury verdict in the Previous Litigation, Cello has granted security interests and mortgages in its assets in a total amount of approximately $2.5 million. In 2009, Cello obtained a loan from Vision Bank in the amount of $950,000 secured by a mortgage on the new Cello plant and a security interest in Cello's equipment. Additionally, in or around the spring of 2009, Cello had obtained another $1 million in alleged loans from BioFuels that were unsecured, but in or around the fall of 2009, Cello

11

granted to BioFuels a mortgage on its plant and a security interest in Cello's equipment. Cello also obtained a $1,750,000 loan from Ted Kennedy that was initially unsecured, but after the entry of the jury verdict in the Previous Litigation, Cello granted Ted Kennedy a mortgage in its plant and a security interest in its equipment. Lastly, in addition to the above mortgages and security interest, judgments have been entered against Cello in favor of various suppliers with respect to services rendered or goods sold to Cello.

## DISCUSSION

### I. Applicability of the automatic stay

The filing of a bankruptcy petition operates as a stay, <u>inter</u> <u>alia</u>, of "the commencement or continuation… of a judicial, administrative, or other action or proceeding against the debtor… or to recover a claim against the debtor that arose before the commencement of the case," and "any act to obtain possession of the property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(1) & (3). The present case is asserted against debtors and non-debtors. Therefore, the various claims would come within the terms of § 362(a) if the claim is (1) to obtain possession of property of or from the estate or (2) to recover a claim against the debtor.

### A. P&W's Fraudulent Transfer Claims

In its complaint, P&W, as a creditor of Cello, Boykin Trust, Jack Boykin, and Allen Boykin, seeks to have certain transfers of property set aside pursuant to the AUFTA, Ala. Code 1975, § 8-9A-1 et seq., on the theory that the properties had been transferred fraudulently. (See Doc. 1). First, as stated above, shortly after receiving the wire transfer of $2.5 million from P&W, Cello began paying Boykin Trust $30,000 per month allegedly as an "engineering fee" for Jack Boykin's services. (Doc. 114-1, L. Boykin Dep., pp. 7-8; Doc. 114-3, p. 13). During the

period between April 2007 and December 31, 2009, Cello paid Boykin Trust approximately $700,000 for Jack's alleged services. Counts I and III of P&W's complaint seek to avoid these transfers and award a judgment in favor of P&W in the amount of the Cello-to-Boykin Trust transfers plus interest. (Doc. 1, pp. 11-14).

Second, Cello wrote two checks in October 2007 for a total of $370,000 to BM&J, who then used $250,000 of these funds to settle a judgment in favor of AmSouth Bank (now Regions Bank) against Environ and Jack Boykin and who used $20,000 to satisfy a judgment in favor of First American Title Insurance Company against Jack. Counts VII and IX of P&W's complaint seek to avoid these transfers and award a judgment in favor of P&W in the amount of the Cello-to-Jack Boykin transfers plus interest. (Doc. 1, pp. 17-19).

Third, Cello made monthly transfers of $30,000 to Boykin Trust beginning on May 3, 2007. Boykin Trust, in turn, transferred part of this money to Lois Boykin and Allen Boykin. Specifically, Boykin Trust paid Lois Boykin a salary of $20,000 per month for writing checks and paying all of the bills. The payment of salary to Lois began in May 2007 and continued through March 2009. In addition to the payments to Lois, in or around January 2008, Boykin Trust paid Lois $30,000 and Allen Boykin $20,000. (Doc. 115-2, p. 2; Doc. 114-1, L. Boykin Dep., pp. 9-10). Similar payments occurred in or around December 2008, when Boykin Trust paid Lois $20,000 and Allen $20,000. (Doc. 115-5, p. 2; Doc. 114-1, L. Boykin Dep., pp. 9-10). Counts XIII and XV of P&W's complaint seek to avoid these transfers and award a judgment in favor of P&W in the amount of the Boykin Trust transfers to Lois, Elisa, and Allen, plus interest. (Doc. 1, pp. 23-25).

Fourth, besides paying Boykin Trust $30,000 per month, Cello also began paying Allen Boykin a salary of $15,000 per month, a payment which he continues to receive to this day.

Cello also paid Allen a $27,000 bonus in November 2007 and an $18,000 bonus in December 2008. Lastly, in 2009, BM&J transferred $25,000 out of its Jack Boykin trust account "for Allen Boykin Divorce." Counts XVI and XVIII of P&W's complaint seek to avoid these transfers and award a judgment in favor of P&W in the amount of the Cello-to-Allen Boykin transfers plus interest. (Doc. 1, pp. 26-28).

As stated above, § 362(a) provides that actions "against the debtor" or "to recover a claim against the debtor" are subject to the automatic stay. It is clear to this court that "a third-party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor' and subject to the automatic stay pursuant to § 362(a)(1)." In re Colonial Realty Co., 980 F.2d 125, 131-132 (2d Cir. 1992). As the Court of Appeals for the Second Circuit explained:

> While a fraudulent action may be an action against a third part, it is also an action "to recover a claim against the debtor." Absent a claim against the debtor, there is no independent basis for the action against the transferee. Moreover, the creditor can only recover property or value thereof received from the debtor sufficient to satisfy the creditor's claim against the debtor. This interpretation is consistent with the legislative history of § 362(a)(1) which states:
>
>> The provision in this first paragraph prohibiting the issuance of process is designed to prevent the issuance of a writ of execution by a judgment creditor of the debtor to obtain property that was property of the debtor before the case <u>but that was transferred</u>, subject to the judgment lien, before the case. Because the other paragraphs of this subsection refer only to property of the estate or property of the debtor, <u>neither of which apply to this kind of transferred property</u>, they would not prohibit pursuit of the transferred property by issuance <u>of process</u>. (emphasis supplied).
>
> H.R. Rep.No. 95-595, 95th Cong., 1st Sess. 341 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 5963, 6297.

In re Colonial Realty Co., 980 F.2d at 132(quoting In re Saunders, 101 B.R. 303, 305-306 (N.D.Fla. 1989)).

In the present action, P&W is clearly seeking to recover a claim against Cello or Boykin Trust with regards to all of the above transfers. The complaint filed by P&W specifically points

14

out that Cello or Boykin Trust are liable to P&W as a result of the judgment in the Previous Litigation and alleges that the non-debtor defendants are liable as fraudulent transferees of Cello or Boykin Trust. Thus, if Cello or Boykin Trust were not liable to P&W on the underlying judgment, P&W would have no independent claim against the non-debtor defendants. This court concludes that the above claims are an "action… to recover a claim against the debtor" within the meaning of § 362(a)(1). These claims are therefore subject to the automatic stay.

## B. Piercing the Corporate Veil

In Count XX of its complaint, P&W asserts that "[d]ue to the conduct of Lois Boykin, Allen Boykin and Elisa Rambo, the corporate veil of Boykin Trust is pierced and Lois Boykin, Allen Boykin and Elisa Rambo are personally liable for the indebtedness owed to P&W by Boykin Trust", thus P&W asks this court to "enter an order awarding damages in favor of P&W against Lois[], Allen[], and Elisa[], jointly and severally, to the extent necessary to satisfy the claim of P&W against Boykin Trust and awarding such other or different relief as the Court deems proper and just." (Doc. 1, pp. 30-31).

As stated above, § 362(a) provides that "a petition filed [in bankruptcy] operates as a stay, applicable to all entities, of… (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). "[A] section 362(a)(3) stay applies to a cause of action that under state (or federal) law belongs to the debtor[.]" In re Icarus Holdings, LLC, 290 B.R. 171, 178-179 (Bankr.M.D.Ga. 2002)(quoting S.I. Acquisition Inc. v. Eastway Delivery Service, Inc. (In re S.I. Acquisition, Inc.), 817 F.2d 1142, 1150 (5th Cir. 1987). Under the Bankruptcy Code, the bankruptcy trustee may bring claims founded, inter alia, on the rights of the debtor and on certain rights of the debtor's creditors. See e.g., 11 U.S.C. § § 541, 544, 547. In other words, the

trustee or debtor-in-possession has the standing to pursue general claims that belong to all creditors but may not have the standing to pursue personal claims which are specific to only one creditor. It appears from P&W's post-trial brief that its claim of piercing the corporate veil is one that could be used by any of Boykin Trust's creditors seeking to recover money from it's principles. This court is unable to determine any circumstance in the present case in which Lois or Allen's alleged disregard of the corporate form would create a particularized injury to only P&W and not to Boykin Trust's other creditors. In other words, once the corporate form has been disregarded, any unpaid creditor of Boykin Trust could argue for piercing the corporate veil. Since it appears that P&W's claim for piercing the corporate veil is property of the estate, this court finds that the automatic stay prevents it from ruling on Count XX of P&W's complaint.

## II. Unjust Enrichment of Allen Boykin

In Count IXX [sic] of its complaint, P&W asserts that "[a]s a result of the fraudulent scheme orchestrated in part by Allen Boykin, Allen Boykin has been unjustly enriched at the expense of and to the detriment and harm of creditors such as P&W" and asks this court to enter an order "awarding judgment in favor of P&W against Allen Boykin in an amount to be determined by the trier of fact to compensate P&W for its damages resulting from Allen Boykin's unjust enrichment…" (Doc. 1, p. 29). The Alabama Supreme Court has stated "[t]o prevail on a claim of unjust enrichment, the plaintiff must show that the defendant holds money which, in equity and good conscience, belongs to the plaintiff or holds money which was improperly paid to defendants because of mistake or fraud… The success of a claim for unjust enrichment depends on the particular facts and circumstances of each case." <u>Atlantic National</u>

Trust, LLC v. McNamee, 984 So.2d 375, 381 (Ala. 2007)(quoting Scrushy v. Tucker, 955 So.2d 988, 1011-1012 (Ala. 2006)(quotation marks omitted).

Based on the evidence presented at trial, this court concludes that Allen Boykin was unjustly enriched by the payment of a salary, bonuses and other compensation, which were the result of a vast fraud perpetrated upon P&W by Allen Boykin, Jack Boykin, Cello, and Boykin Trust, and that equity and good conscience require restitution in the form of repayment of the salary, bonuses, and other compensation Allen Boykin had received. It would be unconscionable to allow Allen Boykin to retain the hundreds of thousands of dollars awarded to him at the expense of a corporation that he personally defrauded. Therefore, this court finds Allen Boykin liable as to Count IXX [sic] in the amount of $695,000.00 plus prejudgment interest.

## CONCLUSION

Pursuant to 11 U.S.C. § 362, the filing of a bankruptcy petition operates as a stay of an action. Accordingly, this action is **STAYED** as to Counts I, II, III, VII, VIII, IX, XIII, XIV, XV, XVI, XVII, XVIII, XX and XXI. Boykin Trust, Cello, and Jack Boykin are **ORDERED** to notify the court within thirty (30) days of the resolution of their respective bankruptcy proceedings or lift of stay, whichever occurs first.

Furthermore, after due consideration of all matters presented and for the reasons set forth herein, this court finds that plaintiff P&W is entitled to a net claim of $695,000 plus prejudgment interest from the defendant Allen Boykin.

**DONE and ORDERED** this 27th day of October, 2010.

/s/ Callie V. S. Granade
UNITED STATES DISTRICT JUDGE