**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **PARSONS & WHITTEMORE** | ) | |
| **ENTERPRISES CORPORATION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CIVIL ACTION NO. 09-631-CG-B** |
| | ) | |
| **CELLO ENERGY, LLC, et al.,** | ) | |
| | ) | |
| **Defendants,** | ) | |
| | ) | |

## ORDER

On September 25, 2009, Parsons and Whittemore Enterprises Corporation ("P&W") brought a lawsuit against Cello Energy, LLC ("Cello"), Boykin Trust, LLC ("Boykin Trust"), Vesta Venture, L.L.C. ("Vesta"), Forest Technologies, LLC ("Forest Technologies"), Jack W. Boykin ("Jack Boykin"), Lois Anne Cowin Boykin ("Lois Boykin"), Allen Boykin, and Elisa Boykin Rambo ("Elisa Rambo") pursuant to the Alabama Uniform Fraudulent Transfer Act ("AUFTA") to "avoid and/or to prevent fraudulent transfers made and proposed to be made by and among members of the Boykin Family and entities they control." (Doc. 1, p. 1). All of the defendants denied the claimant's allegations. (Docs. 5-10, 13). On August 24, 2010, this court granted the defendants' motions for summary judgment as to P&W's claims against Forest Technologies. (Doc. 156). On September 27, 2010, this court granted a joint motion to dismiss P&W's claims against Vesta and Elisa Rambo. (Docs. 163 & 164). A bench trial was held on P&W's remaining claims; testimony was taken and other evidence was received in this matter on September 27, 2010, September 28, 2010, and September 29, 2010. On October 21, 2010, P&W

filed a notice of a bankruptcy filing by Cello, and on October 25, 2010, P&W filed a notice of bankruptcy filings by Boykin Trust and Jack Boykin. On October 27, 2010, this court entered an order finding that P&W was entitled, as to its unjust enrichment claim, to a net claim of $695,000 from Allen Boykin but stayed P&W's cases as to the remainder of the counts. (Doc. 182). On December 7, 2010, the bankruptcy court lifted the stay allowing this court to rule on the remainder of the counts except for the injunctive relief sought by P&W. (Doc. 188, p. 39). Upon consideration of all evidence presented, and for the reasons stated herein, this court finds that P&W is entitled to (1) recover a net claim of $700,000.00 plus pre-judgment interest against Boykin Trust as to Counts I, II, and III; (2) recover a net claim of $399,923.00 plus pre-judgment interest against Jack Boykin as to Counts VII, VIII and IX; (3) recover a net claim of $510,000 against Lois Boykin as to Counts XIII, XIV and XV; (4) recover a net claim of $40,000.00 plus pre-judgment interest against Allen W. Boykin as to Counts XIII, XIV, XV; (5) recover a net claim of $655,000.00 from Allen Boykin as to Count XVI, XVII, XVIII and XIX; and (6) recover a net claim of $10,431,560.50 from Allen Boykin and Lois Boykin, jointly and severally, as to Count XX.

## BACKGROUND

Jack Boykin is the chairman of Cello, a company which he formed in 2004 to allegedly produce synthetic fuels, and since June 2010, has been the sole owner of Boykin Trust. He is the husband of Lois Boykin and the father of Elisa Rambo and Allen Boykin. He earned a bachelor of science degree in chemical engineering at Auburn University and was awarded an honorary doctorate from Huntingdon College, but he is not and has never been a licensed professional engineer. Prior to starting Cello, Jack has been a principal in several entities that had failed. First, Wesley Industries, a company that Jack formed to make pesticides and herbicides, filed for

bankruptcy.  Second, Jack closed Science International, LLC ("Science International"), a company which he founded in the early 2000s.  Third, Environ, LLC ("Environ"), a company which assembled and operated a semi-works plant in Prichard that Jack and Allen claimed made commercial quantities of synthetic fuel, went out of business.

In 2005, Jack Boykin's only reported income was $16,500.00 in social security benefits. Similarly, in 2006, Jack's only reported income was social security benefits totaling $21,198.00. This income was far outweighed by his business losses.  For example, as of July 2006, there were six unpaid judgments against Jack totaling more than $1.9 million: (1) Colonial Bank received a judgment of $777,077.98 on March 30, 2004; (2) SunTrust Bank received a judgment of $178,820.00 on September 28, 2004; (3) Altec Capital received a judgment of $305,830.08 on October 13, 2004; (4) Vision Bank received a judgment of $94,590.26 on September 19, 2005; (5) AmSouth Bank received a judgment of $446,820.89 on November 15, 2005; and (6) First American Title Insurance Company received a judgment of $122,977.83 on July 6, 2006.  Allen Boykin reported $60,000 of taxable income on his 2004 income tax return, $28,000 of taxable income on his 2005 tax return, and only $30,123 on his 2006 income tax return.

In February 2007, Jack and Allen, in hopes of having P&W invest in Cello, told P&W's George Landegger and other representatives that they had made commercial quantities of biofuels from cellulosic materials that met ASTM standards at their semi-works plant in Prichard, Alabama.  Based on this and other representations, P&W entered into an agreement (the "Option Agreement") on April 19, 2007, to pay Cello $2.5 million for an option to acquire a one-third interest in Cello for an additional $10 million upon production by Cello of commercial quantities of diesel fuel, kerosene and gasoline that met ASTM standards.   On April 26, 2007, P&W made a wire transfer of $2.5 million to Cello.

On April 24, 2007, Boykin Trust was formed as a limited liability company under the laws of Alabama. At that time, Lois Boykin had an 80% ownership interest in Boykin Trust, Elisa Rambo had a 10% ownership interest, and Allen Boykin, who was also the president and managing partner, had a 10% ownership interest. Boykin Trust is the sole owner of Cello, and the sole asset of Boykin Trust (other than transitory cash balances distributed primarily to family members) is its ownership interest in Cello. The only business of Boykin Trust was to own Cello. The only address listed for Boykin Trust is a Post Office box, and Boykin Trust did not have a physical address as Lois Boykin performed work for Boykin Trust from her personal residence. None of the members contributed any capital to Boykin Trust at the time it was formed.

Shortly after receiving the wire transfer from P&W, Cello purchased a 2007 Dodge 2500 and a 2007 Chevy Impala for a total of $63,000, vehicles which Allen Boykin and Jack Boykin drive respectively. Furthermore, within days of Cello's receipt of P&W's option payment, Cello began paying Boykin Trust $30,000 per month, purportedly for engineering consulting services provided by Jack. The $30,000 monthly payments continued through March 2009, and in January 2010, Cello made a last $10,000 payment to Boykin Trust. The total amount transferred by Cello to Boykin Trust for the alleged engineering consulting services was $700,000. Jack, however, did not receive this money personally, but rather, Boykin Trust paid Lois Boykin a salary of $20,000 per month for writing checks and paying all of the bills. The payment of salary to Lois began in May 2007 and continued through March 2009 for a total of $460,000. Lois, in turn, paid for the maintenance of the house in which she and Jack lived, his food and clothing, and insurance deductibles for his heath care.

When asked at trial what services Lois had performed in exchange for the $20,000 monthly payments, Jack and Lois testified from a prepared list that she had performed the following services: writing checks and dealing with the accounting firm, coordinating visits of dignitaries to Cello's facilities, assisting with the design of the Cello office building, decorating and furnishing the Cello office building, decorating Cello's lab and production building, break room and guard house, baking cookies and cakes, accompanying her husband Jack on trips, and maintaining the lawn at her home and taking a picture of a tanker leaving Cello's plant. However, in previous depositions, Lois testified that she did not perform any services for that salary and that if she did perform services, she only wrote checks and paid bills. With regards to this discrepancy from her deposition testimony, Lois stated that she was only asked about the services she had performed for Boykin Trust and not for Cello. Lois admitted, however, that she received no payment from Cello for the alleged services.[1] She further testified that the reason she ultimately received a check in the amount of $20,000 per month from Boykin Trust was so she could maximize her social security benefits.[2]

In addition to the payments to Lois, in or around January 2008, Boykin Trust paid Lois $30,000, Elisa Rambo $20,000, and Allen Boykin $20,000. Initially, those payments were characterized on Boykin Trust's income tax return as loans to partners, but at some point

---

[1] Cello employed Elani Tsaltas to pay its bills, handle travel arrangements, coordinate meetings, answer the telephone, maintain all accounting records for Cello, maintain communications with suppliers of Cello and write all correspondence for Cello not personally written by Jack. Ms. Tsaltas was paid $6,000 to $7,000 per month.

[2] Jack also testified that Lois contributed office furniture and equipment to Cello with a value of "at least $70,000 to $80,000." However, a tax asset detail prepared by Cello's accountant valued Cello's office furniture and equipment at $15,846.70 in 2008, and Lois testified that she did not purchase any of the office equipment listed on the tax asset detail. Furthermore, the defendants did not identify the specific furniture and equipment that she allegedly provided.

thereafter, these payments were reclassified as distributions to the members. A document was provided to this court entitled "Special Meeting of the Members of Boykin Trust, L.L.C" and signed by Lois Boykin, Allen Boykin, and Elisa Rambo. This document states that "[a] special meeting of Boykin Trust, L.L.C. was held on Saturday, December 15, 2007," where they agreed to distribute 42.86% of the profit to Lois, 28.57% to Allen, and 28.57% to Elisa in the same monetary amounts listed above. According to Lois, however, a physical meeting did not take place, but rather, she "more than likely" talked to Elisa and Allen individually. She testified that she decided how much she wanted to "share with [her] children" and established that figure as the amount of the distribution rather than an amount pursuant to their respective ownership interests. Lois further testified that the above document was prepared by Xavier Hartmann, the defendants' accountant, and Mr. Hartmann testified that the document was not created until after April 2008, and that it was a "post hoc justification" for varying the percentages of the distributions made to Lois, Allen, and Elisa. Similar payments occurred in or around December 2008, when Boykin Trust paid Lois $20,000, Elisa $20,000, and Allen $20,000. The defendants did not provide any documentation purporting a special meeting of the members of Boykin Trust authorizing the 2008 distributions.

Besides paying Boykin Trust $30,000 per month, Cello also began paying Allen Boykin a salary of $15,000 per month as purported compensation for overseeing the construction of the Bay Minette facility within a week of receiving P&W's option payment.[3] Allen testified that he "was asked if I would construct the facility and explained this would be my salary and I said yes

---

[3] Allen received $30,000 on May 31, 2007, and then $15,000 per month thereafter. (Doc. 115-6, p. 2). This salary was approximately three times what he was paid in 2004 when he worked for Environ, LLC to assemble and operate a semi-works plant in Prichard and approximately six times what he had earned in 2005 and 2006 when he worked for AEL Industries, another family company, after consideration of losses incurred in that business.

and I said thank you and I took it."[4]  Cello also paid Allen a $27,000 bonus in November 2007

and an $18,000 bonus in December 2008.  Allen continues to be paid a salary of $15,000 a

month from Cello.[5]

In October 2007, Cello wrote two checks for a total of $370,000 to the law firm of

Brackin, McGriff, and Johnson, P.C. ("BM&J") who then placed the money into a trust account

titled "Boykin, Jack."   On its financial statement, Cello noted that it paid a legal retainer of

$370,000 which was "being held to negotiate and purchase integral equipment for the plant…"

however the identity of the law firm was not identified.  In January 2008, BM&J wrote a check

for $250,000 to Regions Bank, which merged with AmSouth Bank in 2005, to satisfy a judgment

in favor of AmSouth Bank against Environ and Jack Boykin.  Jack testified that in return for the

$250,000 payment, Cello acquired equipment from Regions that had been repossessed when the

note underlying the judgment went into default.  Jack, however, did not provide any

documentation, such as a bill of sale, in support of this testimony.  He also testified that the plant

and some of the equipment located there were damaged by flood waters in 2004 by Hurricane

Ivan.  Moreover, BM&J also transferred $10,000 on March 24, 2008, from the Jack Boykin Trust

Account to settle a case brought against Jack by First American Title.

Furthermore, in 2009, BM&J transferred $25,000 out of its Jack Boykin trust account as

"fees for Allen Boykin Divorce."  Jack testified that it was possible that Allen's divorce was

---

[4] Allen earned a history degree from Huntington College, and he is not and has never
been a licensed professional engineer.

[5] Prior to working for Cello, Allen served as an assistant construction supervisor for the
construction of a plant by his family and others for eight months in Mississippi in 1988.  He then
worked for his father, Jack Boykin, and also had his own water treatment company on the side
which ceased operating after approximately a year.  In 1994 through 1999, Allen managed and
owned part of a nursery in Montgomery.  From 2004 through 2006, he was the operating or
general member at Forest Technologies and the semi-works plant.

funded from money that Lois had paid to BM&J, and Lois clarified that all monies paid by her to BM&J were "for other things we might need for the company." However, the BM&J trust account does not show a payment from Lois prior to the payment for Allen's divorce, and although she testified that she would bring a cancelled check to court that showed that she made a $50,000 payment to the BM&J trust account, she did not produce the document.[6]

The Option Agreement allegedly prohibited Cello from providing an equity interest or licensing the technology to any investor without first obtaining P&W's permission. However, in September 2007, Allen Boykin, on behalf of Forest Energy Systems, LLC ("FES") and BioFuels Operating Company, executed a document entitled "Manufacturing and Financing Contract" ("MFC"). In the MFC, Biofuels agreed to pay FES a $25 million project fee for the construction of three plants, with a first installment of $12.5 million on the effective date of the contract. Biofuels also received (1) the exclusive right to operate and manage those plants and any other plants constructed to make use of the technology, (2) 49% of an interim gross profit from each plant for up to 80 years, and (3) the exclusive right to provide financing for any plant. On September 14, 2007, BioFuels paid Cello $12.5 million via wire transfer. Following receipt of the project development fee from BioFuels, Jack Boykin placed what remained of the P&W option payment into a separate bank account

---

[6] In regard to all the above transfers, several of the defendants in 2008 and 2009 allegedly loaned money back to Cello. Lois Boykin loaned Cello from May 2009 to November 2009 $163,550 and Cello repaid approximately $95,500 of that said loan. JWB Associates LLC loaned Cello $19,465 from May 2009 to June 2009 and approximately $2,000 of that loan was repaid. Boykin Trust loaned Cello $99,000 from April 2009 to June 2009 and none of that money has been repaid. Jack Boykin had loaned Cello in May 2009, $500, all of which was allegedly repaid. Lois Boykin had loaned $65,000 and $5,000 in April and July 2009 respectively and Boykin Trust had loaned $27,000 from April 2008 to January 2009, and none of these loans had been repaid. The defendants did not provide any documentary evidence of any promise to repay, interest charge, or maturity date.

On October 16, 2007, P&W brought a lawsuit against Cello, Boykin Trust, Jack Boykin, Allen Boykin, and BioFuels and its related companies for injunctive and declaratory relief. (hereinafter referred to as the "Previous Litigation"). (Case No. 07-0743-CG-B, Doc. 1).[7] Construction on the new Cello plant began shortly thereafter in early 2008. On July 16, 2008, the Boykin Defendants in the Previous Litigation filed a motion for a judgment on the pleadings asking this court to declare the Option Agreement invalid. (Id., Doc. 146). By July 24, 2008, Cello had used all of BioFuels' project development fee, thus it began to again use the P&W option proceeds to pay its debts as they became due. In February 2009, this court ruled in the Previous Litigation that the Option Agreement was void ab initio. (Case No. 07-0743-CG-B, Doc. 375). By that time, Cello had spent all of P&W's option payment, all of the project development fee of $12.5 million, $500,000 more advanced by BioFuels, and was then using a $950,000 line of credit from Vision Bank.

For the year that ended on December 31, 2007, Cello had total assets of $14,634,975 and total liabilities of $15,045,215. The liabilities included a line item "Deferred revenue" of $12.5 million. The "Deferred revenue" line item represents the $12.5 million received from BioFuels for the construction of the first plant. Cello noted in its records that it "will recognize the $12.5 million as revenue upon substantial completion of the plant as agreed upon by both parties which is expected to occur by December 31, 2008." The liabilities also included a "Purchase Option" line item for P&W's $2.5 million payment to Cello. Cello noted on the financial statement that "[t]he option could be exercised anytime after the initial payment and before the expiration of 90 days after the refinery being engineered and built in Bay Minette, Alabama, is physically

---

[7] The complaint was amended on July 31, 2008. (Doc. 158).

competed and has passed standard ASTM test for the production of fuel oils, diesel fuel oils, and gasoline."

On a balance sheet dated September 30, 2008, Cello had total assets of $13,344,127 and total liabilities of $15,015,579.  The liabilities continued to list the $12.5 million "Deferred revenue" line item and the $2.5 "Purchase Option" line item.  The "Deferred revenue" line item was thereafter removed from the financial statement for December 31, 2008, lowering Cello's liabilities to $3,815,013.  On the June 30, 2009, balance sheet, Cello reported it had total assets of $13,928,467 and total liabilities of $5,142,627.  On December 31, 2009, Cello reported that it had $13,176,111 in total assets and $7,453,369 in total liabilities.

Although the December 31, 2008, balance sheet indicated that the new Cello plant was substantially completed by the end of 2008, Allen testified that the construction of the plaint was not completed until some time in February or March 2009.  In fact, Cello did not turn the plant over to BioFuels for operation until April 2009.  The plant, however, was returned to Cello on May 26, 2009, as BioFuels determined that the plant was still in pre-commercialization mode.  Samir Kaul of BioFuels testified that he did not believe that the new Cello plan was capable between April 1, and May 29, 2009, of producing cellulosic fuel in commercial quantities that would meet ASTM standards.  Allen Boykin admitted that the new Cello plant has failed to generate enough income to cover expenses.  Over the approximately 18 months since its alleged completion, Cello's plant had generated approximately $17,000 in revenues.

On June 29, 2009, the jury in the Previous Litigation returned a verdict in favor of P&W and against Cello, Boykin Trust, Jack Boykin, and Allen Boyken, for a total of $10.4 million.  First, the jury found from a preponderance of the evidence that P&W proved its breach of the nondisclosure agreement against Cello and Boykin Trust and awarded P&W $2,827,123.00.

Second, the jury found from a preponderance of the evidence that there was a business relationship between P&W and the Boykin Defendants and that Biofuels and its related parties knew of that business relationship at the time of the alleged interference. Third, the jury found from a preponderance of the evidence that P&W proved its fraud claim against Cello, Boykin Trust, Jack Boykin, and Allen Boykin and awarded P&W $104,437.50, and found by clear and convincing evidence that all four defendants consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to this claim and awarded punitive damages of $7.5 million. (Doc. 109-1, pp. 2-5). With regards to the punitive damages award, this court found that:

> The evidence before the jury established a pattern of intentional misconduct on the part of the Boykin Defendants leading to repeated damage to P&W. This misconduct included making one or more false statements or promises including that the defendants had previously produced one or two million gallons of fuel using the Technology with feedstock that included cellulosic materials; that they possessed test results documenting the fuel had met ASTM standards; that they had properly filed patent applications protecting the Technology; that they had ability to fund the balance necessary for financing the construction costs and working capital needs of the Bay Minette plant beyond the $2.5 million invested by P&W; that they would use the $2.5 million only for construction of the Bay Minette plant; that Cello would provide full and transparent disclosure of the Technology; and that they would engage P&W to provide services and expertise during design and construction of the plant. Additionally, there is no question that the harm to P&W was the result of intentional malice, trickery, or deceit by the Boykin Defendants…
>
> The Boykin Defendants did not sell petroleum goods to P&W, but rather, they fraudulently misrepresented that they could make a specific type of petroleum with non-existent Technology in hopes of inducing P&W to engage in a multi-million dollar transaction.
>
> (See S.D.AL. Case No. 07-743, Doc. 593, pp. 7 & 9).

In November 2009, Cello paid approximately $131,304.77 to Vision Bank to satisfy a judgment against Science International and Jack. At the same time, Cello paid approximately $8,617.40 to Vision Bank to extinguish a line of credit in favor of JWB Associates, LLC, an

entity which is solely owned by Jack. Furthermore, since the jury verdict in the Previous

Litigation, Cello has granted security interests and mortgages in its assets in a total amount of

approximately $2.5 million. In 2009, Cello obtained a loan from Vision Bank in the amount of

$950,000 secured by a mortgage on the new Cello plant and a security interest in Cello's

equipment. Additionally, in or around the Spring of 2009, Cello had obtained another $1 million

in alleged loans from BioFuels that were unsecured, but in or around the fall of 2009, Cello

granted to BioFuels a mortgage on its plant and a security interest in Cello's equipment. Cello

also obtained a $1,750,000 loan from a person identified as Ted Kennedy that was initially

unsecured, but after the entry of the jury verdict in the Previous Litigation, Cello granted Ted

Kennedy a mortgage in its plant and a security interest in its equipment. Lastly, in addition to

the above mortgages and security interest, judgments have been entered against Cello in favor of

various suppliers with respect to services rendered or goods sold to Cello.

## DISCUSSION

### I. Alabama Uniform Fraudulent Transfer Act

In its complaint, P&W, as a creditor of Cello, Boykin Trust, Jack Boykin, and Allen

Boykin, seeks to have certain transfers of property set aside pursuant to the AUFTA, Ala. Code

1975, § 8-9A-1 et seq., on the theory that the properties had been transferred fraudulently. (See

Doc. 1). The AUFTA recognizes two different types of fraudulent transfers: actual fraud and

constructive fraud. First, § 8-9A-4(a) allows a creditor to recover a transfer where the creditor

proves actual fraud:

> A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's
> claim arose before or after the transfer was made, if the debtor made the transfer
> with actual intent to hinder, delay, or defraud any creditor of the debtor.
>
> Ala.Code § 8-9A-4(a).

Second, §§ 8-9A-4(c) and 8-9A-5(a) allow a creditor to recover a transfer where the creditor proves constructive fraud. Section 8-9-4(c), Ala. Code 1975 states:

> A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor:
>
> > (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Section 8-9A-5(a) states:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer.

Insolvency is defined by the AUFTA as (1) "if the sum of the debtor's debts are greater than all of the debtor's assets at a fair valuation"; or (2) if "a debtor… is generally not paying his debts as they become due". Id. § 8-9A-2(a) and (b). Under the AUFTA, "[a]ssets… do not include property that has been transferred, concealed, or removed with intent to hinder, delay or defraud creditors or that have been transferred in a manner making the transfer voidable under this chapter." Id. § 8-9A-2(d).

In general, a "creditor" is defined as "[a] person who has a claim" and a "claim" is defined as "[a] right of payment, whether or not the right is reduced to judgment, liquidated, unliquidated, contingent, unmatured, disputed, undisputed, legal, equitable, secured or unsecured…" Id. § 8-9A-1(3) & (4). A "debtor" is defined as "[a] person who is liable on a claim." Id., § 8-9A-1(6). An "insider" includes, which is not a limiting term, the following: (1) if the debtor is an individual, (a) a relative of the debtor or of a general partner of the debtor; (b)

a partnership in the which the debtor is a general partner; (c) a general partner in a partnership in which the debtor is a general partner; or a corporation of which the debtor is a director, officer, or person in control; and (2) if the debtor is a corporation, (a) a director of the debtor; (b) an officer of the debtor; (3) a person in control of the debtor; (4) a partnership in which the debtor is a general partner; (5) a general partner in a partnership in which the debtor is a general partner; or (6) a relative of a general partner, director, officer, or person in control of the debtor.  Id. § 8-9A-1(8).

## II. Constructive Fraud under Alabama Code § § 8-9A-5(a)

### A. "Reasonably Equivalent Value"

In order to establish constructive fraud pursuant § 8-9A-5(a), P&W must first show that a debtor who has transferred an asset did not receive "reasonably equivalent value" for that transfer.  Reasonably equivalent value means that "the debtor has received value that is substantially comparable to the worth of the transferred property."  BFP  v. Resolution Trust Corp., 511 U.S. 531, 548, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994).

### 1. Cello-to-Boykin Trust Transfers

As stated above, shortly after receiving the wire transfer of $2.5 million from P&W, Cello began paying Boykin Trust $30,000 per month allegedly as an "engineering fee" for Jack Boykin's services.   During the period between April 2007 and December 31, 2009, Cello paid Boykin Trust $700,000 for Jack's alleged services.  Count I of P&W's complaint seeks to avoid these transfers pursuant to § 8-9A-5 and award a judgment in favor of P&W in the amount of the Cello-to-Boykin Trust transfers plus interest.  (Doc. 1, pp. 11-14).  This court finds that not only did Cello not receive reasonably equivalent value for the money it paid Boykin Trust, but that Cello did not receive any value from Jack's alleged engineering services.   Jack misrepresented

his ability to produce fuel from cellulosic materials in commercial quantities, and, to date, Jack has not produced any evidence that the Cello plant is able to produce any such fuel. In fact, the Cello plant, which was the alleged benefit that Cello received from Jack's engineering expertise, has only received $17,000 total in revenue, an amount which is approximately half what Cello paid in just one month to Boykin Trust. In sum, the court concludes that Cello did not receive reasonably equivalent value in exchange for the $700,000 it paid to Boykin Trust.

### 2. Cello-to-Jack Boykin Transfer

As stated above in the findings of fact, Cello wrote two checks in October 2007 for a total of $370,000 to BM&J, which then used $250,000 of these funds to settle a judgment in favor of AmSouth Bank (now Regions Bank) against Environ and Jack Boykin and which used $20,000 to satisfy a judgment in favor of First American Title Insurance Company against Jack. Furthermore, Cello paid $131,305 to Vision Bank to satisfy a judgment against Science International and Jack and also paid $8,617.40 to Vision Bank to extinguish a line of credit in favor of JWB Associates, LLC, an entity which is solely owned by Jack. Count VII of P&W's complaint seeks to avoid these transfers pursuant to § 8-9A-5 and award a judgment in favor of P&W in the amount of the Cello-to-Jack Boykin transfers plus interest. (Doc. 1, pp. 17-19).

This court finds that Cello did not receive reasonably equivalent value for the $399,923 transferred to Jack to pay Jack's creditors. First, as discussed above, Jack provided no value to Cello in the form of services. Second, while Jack contends that $250,000 of these transfers were used to purchase equipment from Regions Bank that Regions Bank had repossessed from Environ, Jack provided no documentation such as a bill of sale or any other evidence to support this contention. Furthermore, Jack testified that Hurricane Ivan had damaged the equipment that

was located at the old semi-works plant. In sum, the court concludes that Cello did not receive reasonably equivalent value in exchange for the $399,923 it paid to Jack's creditors.

### 3. The Boykin Trust Transfers to Lois Boykin and Allen Boykin

As stated above, Cello made monthly transfers of $30,000 to Boykin Trust beginning on May 3, 2007. Boykin Trust in turn transferred part of this money to Lois Boykin and Allen Boykin. Specifically, Boykin Trust paid Lois Boykin a salary of $20,000 per month which began in May 2007 and continued through March 2009. Furthermore, in or around January 2008, Boykin Trust paid Lois $30,000 and Allen Boykin $20,000. Similar payments occurred in or around December 2008, when Boykin Trust paid Lois $20,000 and Allen $20,000. Count XIII of P&W's complaint seeks to avoid these transfers pursuant to § 8-9A-5 and award a judgment in favor of P&W in the amount of the Boykin Trust transfers to Lois and Allen, plus interest. (Doc. 1, pp. 23-25).

This court finds that Boykin Trust did not receive reasonably equivalent value in exchange for the above transfers. In regards to Lois' salary of $20,000 per month, Lois, at trial, offered a list of services she had provided in exchange for her monthly salary including baking cookies and coordinating visits of dignitaries to Cello's facilities. This testimony, however, is diametrically opposed to her testimony in the Previous Litigation and in several prior depositions when she admitted that the only services she had provided Boykin Trust was paying bills and writing checks. When pressed to explain this change in testimony, Lois admitted that the additional services she listed were actually provided to Cello and not Boykin Trust. When looking at just the services that Lois provided to Boykin Trust, it is clear to this court that Boykin Trust did not receive reasonably equivalent value in exchange for the $20,000 per month salary. In fact, Elani Tsaltas, who was employed by Cello to pay its bills, handle travel arrangements,

and maintain all accounting records for Cello, was paid only $6,000 to $7,000 per month which was almost a fourth of what Lois was paid for performing the same services. Additionally, Lois admitted that she was paid a salary of $20,000 because Jack and she wanted to maximize her social security benefits and not because Lois was performing commensurate services in return for her pay.

The court finds that Boykin Trust did not receive reasonably equivalent value in exchange for the payments made to Lois and Allen at the beginning and end of 2008. The funds used to make these transfers were not given by Cello to Boykin Trust for reasonably equivalent value, thus the money that was then transferred to the shareholders was also not given for reasonably equivalent value. However, even if this were not the case, Lois and Allen provided no capital or any other services at any time to Boykin Trust in exchange for these distributions. Moreover, it is undisputed that these payments were not in line with each shareholders' respective interest,[8] and there is no reliable documentation justifying these distributions.[9]

---

[8] Alabama law provides that members of a limited liability company are to receive distributions as provided by the operating agreement or if the operating agreement does not so provide, which in this case it does not, then in proportion to their respective interest. See Ala. Code § 10-12-28.

[9] As to the distributions in late 2008, the defendants have provided no documentation justifying the amounts paid to the shareholders. Moreover, while they attempt to justify the transfers made in early 2008 by claiming that an amended distribution schedule was ratified by a special meeting of the members, the provided documents that show this are not reliable. Specifically, the Cello Defendants provide a document entitled "Special Meeting of the Members of Boykin Trust, L.L.C" and signed by Lois Boykin, Allen Boykin, and Elisa Rambo that states "[a] special meeting of Boykin Trust, L.L.C. was held on Saturday, December 15, 2007," where they agreed to distribute 42.86% of the profit to Lois, 28.57% to Allen, and 28.57% to Elisa, but Lois testified that a physical meeting actually never took place but that she probably talked to Allen and Lois individually, and Xavier Hartman, who prepared the document, testified that the document was not created until after April 2008 and that it was a "post hoc justification" for the above percentages.

### 4. The Cello-to-Allen Boykin Transfers

As discussed above, besides paying Boykin Trust $30,000 per month, Cello also began paying Allen Boykin a salary of $15,000 per month,[10] a payment which he continues to receive to the time of trial. Cello also paid Allen a $27,000 bonus in November 2007 and an $18,000 bonus in December 2008. Lastly, in 2009, BM&J transferred $25,000 out of its Jack Boykin trust account "for Allen Boykin Divorce." Count XVI of P&W's complaint seeks to avoid these transfers pursuant to § 8-9A-5 and award a judgment in favor of P&W in the amount of the Cello-to-Allen Boykin transfers plus interest. (Doc. 1, pp. 26-28). As in the above analysis of Jack Boykin's services to Cello, the court finds that Cello did not receive reasonably equivalent value for the transfers to Allen because Allen, like Jack, fraudulently misrepresented his knowledge, experience and expertise in constructing a plant that could produce commercially viable cellulosic fuel.

### B. Insolvency

Once P&W establishes that the debtor had made a transfer without receiving reasonably equivalent value in exchange for the transfer, P&W must then show that "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer." Ala.Code. § 8-9A(5)(a). Insolvency is defined by the AUFTA as (1) "if the sum of the debtor's debts are greater than all of the debtor's assets at a fair valuation"; or (2) if "a debtor… is generally not paying his debts as they become due". Id. § 8-9A-2(a) and (b).[11] The first definition of

---

[10] Allen received $30,000 on May 31, 2007, and then $15,000 per month thereafter. (Doc. 115-6, p. 2).

[11] This definition was taken from the Uniform Fraudulent Transfer Act which in turn derived its definition "from the definition of 'insolvent' in § 101(29)(A) of the Bankruptcy Code." UNIFORM FRAUDULENT TRANSFER ACT § 2 cmt. 1 (1984).

insolvency under the AUFTA is referred to as the "balance sheet test." See In re Golden Mane Acquisitions, Inc., 221 B.R. 963, 967 (Bank.N.D.Ala. 1997)(citations omitted); see also Universal Church v. Geltzer, 463 F.3d 218, 226 (2d Cir. 2006)(used the "balance sheet test" to determine insolvency in analyzing an alleged constructive fraudulent transfer). "The law is well settled that the value of an asset under the balance sheet test is neither the asset's value in the best case, nor is it the asset's value in the worst case." In re Golden Mane, 221 B.R. at 967(citations omitted). "Rather, most courts have assigned assets their market value at the time of the disputed transfers when assessing asset values" and then the courts compare those values to the debtor's liabilities. Id. at 968(citations omitted). A court, however, does not need to conduct a piecemeal or asset-by-asset valuation method, but rather, may use a "business enterprise method," a technique which is consistent with generally accepted accounting principles ("GAAP"). See In re PWS Holding Corp., 228 F.3d 224, 241 (3d Cir. 2000)(finding that the Alabama Fraudulent Transfer Act does not appear to require the asset-by-asset approach and that using the "business enterprise method" was not in error). In using the "business enterprise method," a court may start "with the debtor's balance sheet prepared according to [] GAAP and then modify those values to more accurately reflect the debtor's financial condition based on other available evidence." In re Heilig-Meyers Co., 328 B.R. 471, 480 (E.D.Va. 2005)(citing In re Joshua Slocum, Ltd., 103 B.R. 610, 623-624 (Bankr.E.D.Pa. 1989)("While GAAP principles do not control this court's determination of insolvency, we are inclined to accord weight to a company's treatment of its assets and liabilities according to GAAP.").

It is undisputed that Cello's balance sheets dated December 31, 2007, and September 30, 2008, show that Cello's total liabilities exceed its assets, thus this court finds that prior to September 30, 2008, Cello, and in turn Boykin Trust, were insolvent as defined by the AUFTA.

On its December 31, 2008, balance sheet, however, Cello removed a $12.5 million "Deferred revenue" line item, indicating that Cello was solvent with its assets exceeding its liabilities by approximately $10.2 million.[12] This court finds that the removal of this line-item at that time was improper because the $12.5 million payment from Biofuels cannot be treated as earned income and thus an asset because it was not earned as of December 31, 2008. In other words, the removal of the deferred revenue line could only happen if the Cello plant was completed, and it is undisputed that the construction of the plant was not completed, at the earliest, until some time in February or March of 2009. Therefore, a more accurate reflection of Cello's, and in turn Boykin Trust's, financial condition in December 31, 2009, was that it remained insolvent.

The court also finds that Cello and Boykin Trust remained insolvent through December 31, 2009. In its June 30, 2009, financial statement, Cello indicates that it had a net worth of approximately $8.8 million, and Cello indicates in its December 30, 2009 financial statement, that it had a net worth of approximately $5.7 million. Like with the December 31, 2008, financial statement, these numbers should be adjusted downward to account for the "Deferred Revenue" line-item. While Cello turned the plant over to BioFuels for operation in April 2009, the plant was returned on May 26, 2009, as BioFuels determined that the plant was not ready yet to be handed over as it was still in pre-commercialization mode. In fact, Samir Kaul of BioFuels testified that he did not believe that the new Cello plant was capable, between April 1, and May 29, 2009, of producing cellulosic fuel in commercial quantities that would meet ASTM standards. To date, the plant remains in the hands of Cello and has not yet created any cellulosic

---

[12] As stated above, the "Deferred revenue" line item represents the $12.5 million received from BioFuels for the construction of the first plant. Cello noted in its records that it "will recognize the $12.5 million as revenue upon substantial completion of the plant as agreed upon by both parties which is expected to occur by December 31, 2008."

fuel in commercial quantities that would meet ASTM standards. In addition, over the approximately 18 months since its alleged completion until the time of trial, Cello's plant has generated approximately $17,000 in revenues. The court finds that the plant was not and still has not been substantially completed, thus a reduction of Cello's net worth in June 30, 2009 and December 31, 2009 of $12.5 million more accurately reflects the financial condition of both Cello and Boykin Trust.

Alternatively, two other adjustments should be made to more accurately reflect Cello's financial condition in 2009. First, and most importantly, each of the financial statements should be adjusted to account for the full amount of the jury verdict in the Previous Litigation. As stated above, on June 29, 2009, the jury in the Previous Litigation returned a verdict in favor of P&W and against Cello, Boykin Trust, Jack Boykin and Allen Boykin, for a total of $10.4 million. With its June 30, 2009, financial statement, Cello's accountants wrote that because "[t]he judge had made no final ruling on the jury's decision... the June 30, 2009 financial statements include an accrual of $2,500,000 related to these damages" and that "[t]he amount of any additional accrual, if needed, will be determined and recorded at the time of the judge's final ruling." This exact language was also included in a letter attached to the December 31, 2009, financial statement. While it is true that P&W may not have recovered the full $10.4 million from the above four defendants until this court entered a final judgment, this jury award is still a contingent liability and a reduction of Cello's net worth by $7.9 million more accurately reflects Cello and Boykin Trust's financial condition in 2009. Second, Cello and Boykin Trust's net worth in June 30, 2009, should have been reduced by $1.5 million for needed repairs to equipment at Cello's plant. Jack Boykin testified that by June 30, 2009, $1.5 million was needed to repair equipment at Cello's plant in order for the plant to operate. Therefore, this court

alternatively finds that a modification downward of $9.4 million of Cello's net worth on June 30, 2009, and of $7.9 million on December 31, 2009, more accurately reflects Cello and Boykin Trust's financial condition in 2009.

In sum, Cello and Boykin Trust's net worth, after several adjustments to better reflect their financial condition, indicate that Cello and Boykin Trust were insolvent at the time each of the above transfers were made. In light of this finding and the findings above with regards to the reasonable equivalent value analysis, this court holds that all of the above transfers were constructively fraudulent pursuant to Alabama Code § 8-9A-5.[13]

### III. Actual Fraud under Alabama Code § 8-9A-4(a)

Counts II, VIII, XIV, and XVII of P&W's complaint seek to avoid the above transfers pursuant to § 8-9A-4(a) and award a judgment in favor of P&W in the amount of each of the above transfers plus interest. (Doc. 1). As stated above, section 8-9A-4(a) provides that:

> A transfer made by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor.

> Ala.Code § 8-9A-4(a).

In determining "actual intent," the AUFTA provides a non-exclusive list of factors or "badges of fraud" that a trier of fact may consider: (1) whether the transfer was to an insider; (2) whether the

---

[13] Because the court finds that the above transfers were constructively fraudulent under Alabama Code § 8-9A-5, the court need not analyze these transfers under Alabama Code § 8-9A-4(c). However, thecourt finds alternatively that the transfers were constructively fraudulent under this statute as well. First, as stated above, none of the debtors received reasonably equivalent value in exchange for the transfers. Second, Cello and Boykin Trust engaged in a transaction with P&W during which Cello, Boykin Trust, Jack Boykin and Allen Boykin knew that they would be unable to generate revenue or maintain assets that would allow Cello to remain a viable business. Also, the defendants knew or should have known that they would incur debts beyond their ability to pay when it induced P&W to pay $2.5 million dollars through fraud.

debtor retained possession or control of the property transferred after the transfer; (3) whether the transfer was disclosed or concealed; (4) whether before the transfer was made, the debtor had been sued or threatened with suit; (5) whether the transfer was of substantially all the debtor's assets; (6) whether the debtor absconded; (7) whether the debtor removed or concealed assets; (8) whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) whether the debtor was insolvent or became insolvent shortly after the transfer was made; (10) whether the transfer occurred shortly before or after a substantial debt was incurred; and (11) whether the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor. Id., § 9-9A-4(b).

This court finds that all of the above transfers were made with the intent by the transferors to defraud, hinder and/or delay creditors. There is no question that Cello, Boykin Trust, Allen Boykin and Jack Boykin intentionally defrauded P&W in hopes of inducing P&W to make a $2.5 million investment by intentionally misrepresenting that they could make a specific type of petroleum with non-existent Technology. Furthermore, the above transfers immediately began after P&W made its initial investment, and many of the transfers were made with the funds from that investment. Furthermore, these transfers were all made shortly before or after substantial debts were incurred. (Factor # 10). It is undisputed that these transfers were all made to insiders (Factor #1) and that the majority of these transfers were made after the transferors had been sued or threatened with suit (Factor #4). Furthermore, as stated above, none of transferors' received reasonably equivalent value in exchange for the transfers it made (Factor

#8), and Cello was insolvent at all times these transfers were made (Factor # 9). Lastly, many of the transfers were concealed.[14] (Factor #7).

In sum, six "badges of fraud" are present in this case. While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance, several of them when considered together may afford a basis to infer fraud, especially taking into account that Cello, Boykin Trust, Jack Boykin and Allen Boykin intentionally defrauded P&W to receive the funds from which most of the transfers were made. Taking into account all of the circumstances surrounding the transfers, this court finds that all of the transfers were made with the intent to defraud, hinder or delay creditors, thus all of the above transfers were actually fraudulent pursuant to Alabama Code § 8-9A-4(a).

## IV. Piercing the Corporate Veil

In Count XX of its complaint, P&W asserts that "[d]ue to the conduct of Lois Boykin [and] Allen Boykin [], the corporate veil of Boykin Trust is pierced and Lois Boykin [and] Allen Boykin [] are personally liable for the indebtedness owed to P&W by Boykin Trust", thus P&W asks this court to "enter an order awarding damages in favor of P&W against Lois [and] Allen[] jointly and severally, to the extent necessary to satisfy the claim of P&W against Boykin Trust

---

[14] First, the transfers from Cello to Boykin Trust and then to Lois in the form of salary and other payments was clearly a stratagem to fund Jack's lifestyle while shielding the funds from Jack's numerous creditors. Second, the transfers from Cello to Jack's creditors was initially labeled as prepaid legal services and then later as bank charges on Cello's financial statements when in fact these transfers were neither, and merely used to pay off certain of Jack's judgment creditors. Third, Cello's $25,000 payment for Allen Boykin's divorce was paid by Cello without disclosure and were later discovered by P&W only when it obtained the defendants' attorney's trust account records via a motion to compel. Fourth, the year-end distributions by Boykin Trust to Lois and Allen were initially labeled as loans to its shareholders, but that description was later changed to distributions and those distributions were then justified by a signed meeting minutes document that was created after-the-fact merely to justify the unusual distribution percentages.

and awarding such other or different relief as the Court deems proper and just." (Doc. 1, pp. 30-31).

In regard to piercing the corporate veil, the Alabama Supreme Court "has applied the following factors in justifying imposing personal liability on a shareholder: '1) inadequacy of capital; 2) fraudulent purpose in conception or operation of the business; 3) operation of the corporation as an instrumentality or alter ego." Ex parte Hornsby, 958 So.2d 869, 871 (Ala. 2006)(quoting Culp v. Economy Mobile Homes, Inc., 895 So.2d 857, 859-860 (Ala. 2004)). Even though limited liability law is more relaxed than corporate law, the ability to pierce the corporate veil extends to limited liability companies. Filo Am., Inc. v. Olhoss Trading Co., L.L.C., 321 F.Supp.2d 1266, 1268-1269 (M.D.Ala. 2004).

This court finds that it is necessary to impose personal liability on Allen and Lois as to P&W's claim against Boykin Trust because Boykin Trust was formed for a fraudulent purpose and because Lois, Jack, and Allen operated Boykin Trust as an instrumentality to fund their personal expenses. On April 19, 2007, P&W entered into an agreement to pay Cello $2.5 million for an option to acquire a one-third interest in Cello. On April 24, 2007, Boykin Trust was formed for the sole purpose of owning Cello, and none of the shareholders provided any capital to Boykin Trust. On April 26, 2007, P&W made a wire transfer of $2.5 million to Cello. With malice, trickery, or deceit, Cello, Boykin Trust, Jack Boykin, and Allen Boykin intentionally made one or more false statements or promises in hopes of inducing P&W to engage in this multi-million dollar transaction. This money was funneled in part through Boykin Trust to Lois Boykin, who would then pay for Jack Boykin's living expenses, and also to Allen Boykin who was an active participant in the original fraud. As an 80% owner of Boykin Trust, Lois, with Jack's help, directed this scheme to ensure that Jack and Allen would benefit personally from the

funds given by P&W while evading Jack's other creditors. Because of this and because Allen's active participation in the original fraud, this court finds that Allen and Lois ought to be held personally liable for P&W's claim against Boykin Trust.

## CONCLUSION

After due consideration of all matters presented and for the reasons set forth herein, this court finds that the plaintiff P&W is entitled to (1) recover a net claim of $700,000.00 plus pre-judgment interest against Boykin Trust as to Counts I, II, and III; (2) recover a net claim of $399,923.00 plus pre-judgment interest against Jack Boykin as to Counts VII, VIII and IX; (3) recover a net claim of $510,000 against Lois Boykin as to Counts XIII, XIV and XV; (4) recover a net claim of $40,000.00 plus pre-judgment interest against Allen W. Boykin as to Counts XIII, XIV, XV, and XIX; (5) recover a net claim of $655,000.00 from Allen Boykin as to Count XVI, XVII, XVIII, and XIX; and (6) recover a net claim of $10,431,560.50 from Allen Boykin and Lois Boykin, jointly and severally, as to Count XX. P&W, however, is only entitled to recover from Cello, Boykin Trust, Allen Boykin, Jack Boykin, and Lois Boykin, jointly and severally, a net total amount of $10,431,560.50 for both the above six findings and for the jury award in the previous litigation.

**DONE** and **ORDERED** this 3rd day of February, 2011.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE